[No. C034739. Third Dist. Oct. 26, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY GEORGE RAVIART, Defendant and Appellant.

**COUNSEL**

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stephen G. Herndon and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, J.**—Defendant Danny George Raviart was convicted by a jury of two counts of robbery, one count of being a convicted felon in possession of a firearm, one count of possession of methamphetamine, and two counts of assault with a firearm on a peace officer. On appeal, defendant contends there was insufficient evidence to support one of his assault convictions and the jury was improperly instructed on the elements of assault. He also contends the trial court committed misconduct by intervening in the examination of witnesses. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In late February 1999, defendant became a suspect in a series of robberies, some of them armed, that had occurred in the Sacramento area between

January 26 and February 19. On February 24, 1999, law enforcement officers learned defendant was at a motel on Jibboom Street. Among the officers who went there that evening to arrest defendant were Sacramento Police Officers John Keller and Joe Wagstaff. In a confrontation with defendant outside the motel, Officers Keller and Wagstaff shot defendant several times after he pointed a handgun at Officer Keller.

Defendant was charged in an amended information with 11 counts of robbery, one count of attempted robbery, six counts of being a convicted felon in possession of a firearm, one count of unlawful taking of a vehicle, one count of possession of methamphetamine, and two counts of assault with a firearm on a peace officer. The information also alleged numerous weapons enhancements and prior felony convictions.

The case was tried to a jury in November 1999. The court granted defendant's motion for judgment of acquittal on four robbery counts and one felon in possession of a firearm count due to insufficient evidence. The prosecution dismissed another felon in possession of a firearm count during closing argument. The jury found defendant guilty of two of the seven remaining robbery counts, one of the four remaining felon in possession of a firearm counts, the possession of methamphetamine count, and both counts of assault with a firearm on a peace officer. The jury was unable to reach verdicts on the remaining 10 counts, and the court granted a mistrial on those charges. After finding true the prior conviction allegations, the court sentenced defendant under the "Three Strikes" law to six consecutive terms of 25 years to life, with one term stayed pursuant to Penal Code section 654 and with 26 additional years for various enhancements.

## DISCUSSION

### Sufficiency of the Evidence

■ Defendant first contends there was insufficient evidence to support his conviction for assault with a firearm on Officer Wagstaff because "[t]here was no evidence presented that [defendant] pointed the gun at Wagstaff[] at any time." Defendant contends "[t]he only act performed by [defendant] upon which an assault charge could be based was the single act of pointing the gun at Officer Keller." For the reasons that follow, we disagree.

■ When a defendant challenges the sufficiency of the evidence to support a criminal conviction, " '[t]he test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the

evidence proves guilt beyond a reasonable doubt. The court must view the entire record in the light most favorable to the judgment (order) to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the [defendant] guilty beyond a reasonable doubt. In making such a determination we must view the evidence in a light most favorable to respondent and presume in support of the judgment (order) the existence of every fact the trier could reasonably deduce from the evidence.'" (*In re Paul C.* (1990) 221 Cal.App.3d 43, 52 [270 Cal.Rptr. 369] quoting *In re Oscar R.* (1984) 161 Cal.App.3d 770, 773 [207 Cal.Rptr. 789].)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) ▇ Defendant suggests there was no evidence he attempted to injure Officer Wagstaff because there was no evidence he ever pointed his gun at Wagstaff. Defendant also contends there was no evidence he had the present ability to injure Officer Wagstaff because Wagstaff was in a "protected position," sheltered by the corner of the motel, when the shooting occurred.

Assault with a deadly weapon can be committed by pointing a gun at another person (*People v. Laya* (1954) 123 Cal.App.2d 7, 16 [266 P.2d 157]), but it is not necessary to actually point the gun directly at the other person to commit the crime. Three examples will illustrate the point.

In *People v. McMakin* (1857) 8 Cal. 547, there was evidence the defendant pointed a revolver toward another person, "but with the instrument so pointed, that the ball would strike the ground before it reached the witness, had the pistol been discharged." (*Ibid.*) The Supreme Court affirmed the defendant's conviction for assault, stating: "Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So, any other similar act, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault. . . . [¶] . . . [¶] . . . [W]hen the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself, at the same time declaring his determination to use it against the other, the jury are fully warranted in finding that such was his intention." (*Id.* at pp. 548-549, italics omitted.)

In *People v. Hunter* (1925) 71 Cal.App. 315 [235 P. 67], there was evidence the defendant attempted to draw a pistol from his sock to shoot his wife, but she jumped out the window before he could do so. (*Id.* at

pp. 317-318.) On appeal, the defendant contended the evidence was "insufficient to prove the alleged assault in that it does not show that the defendant attempted to use the weapon." (*Id.* at p. 318.) The court disagreed, stating: "The evidence is ample to show that the defendant had the intention and the present ability to kill his wife. The only question remaining is whether he attempted to carry his purpose into execution. To accomplish that purpose, it was necessary for him to take the gun from his sock, to point it at his wife, and to pull the trigger. Any one of these would constitute an overt act toward the immediate accomplishment of the intended crime. He was endeavoring to take the gun from his sock when his wife thwarted the attempt to kill her by jumping out of the window. Naturally she did not wait to see whether he succeeded in getting hold of the gun or whether he pointed it at her, and it is immaterial whether he did either. The actual transaction had commenced which would have ended in murder if it had not been interrupted." (*Id.* at p. 319.)

Finally, in *People v. Thompson* (1949) 93 Cal.App.2d 780 [209 P.2d 819], there was evidence the defendant pointed a revolver toward two sheriff's deputies, aiming between them and pointing the gun downward. The appellate court held the defendant's actions were sufficient to support his conviction on two counts of assault with a deadly weapon, noting that "[w]hile [the defendant] did not point the gun directly at [the deputies] or either of them, it was in a position to be used instantly." (*Id.* at p. 782.)

In light of the foregoing authorities, and viewing the evidence in the light most favorable to the judgment, there is substantial evidence in the record to support the jury's finding that defendant assaulted both officers in the confrontation outside the motel. Officer Keller testified that he and Officer Wagstaff, who has a canine partner, decided to arrest defendant as he and a female companion were getting into a car on the south side of the motel. As the officers were approaching the motel parking lot in their vehicle, a California Highway Patrol unit not involved in defendant's arrest pulled in across the street and illuminated the parking lot with its headlights. Defendant and his companion headed back toward their motel room, and Officers Keller and Wagstaff followed in an attempt to apprehend defendant before he got back into the room.

Officer Keller testified that when he rounded the stairway at the corner of the building in pursuit of defendant, Officer Wagstaff was to his left and slightly ahead of him, although he did not know whether Wagstaff had been on the walkway between the stairway and the building or had rounded the stairway ahead of him. Officer Keller testified that he "came around the stairs wide" because he knew Officer Wagstaff was to his left toward the

building, and he was concerned about getting bitten by Officer Wagstaff's dog. As Officer Keller came around the corner, he saw defendant pointing a chrome handgun directly at him. At the same time, he heard Officer Wagstaff yell "Gun." Both officers fired at defendant. Officer Keller testified that when he fired, Officer Wagstaff was crouching at the corner of the building, partially behind the building but with his arm extended around the corner to fire at defendant. Officer Keller fired five rounds, until defendant was on the ground. As he did so, he moved to the corner where Wagstaff was, where they both took cover. Keller testified that it was approximately five feet from where he started firing to where he took cover with Wagstaff behind the corner of the building. When there was no return fire, they came out from behind the corner and saw defendant on the ground with the gun slightly above his head.

Douglas Moutinho, an agent with the California Department of Justice, Bureau of Narcotic Enforcement, Violence Suppression Unit, testified that he was behind Officer Wagstaff as Wagstaff and Keller approached the corner of the motel in pursuit of defendant. Moutinho saw Wagstaff pass the corner of the building and step out into the open. Moutinho heard Wagstaff give some kind of command to defendant, "instructing him to put his hands up and orders like that," then heard Wagstaff yell "Gun" several times and dive back to the corner of the building. Moutinho then saw Wagstaff fire back down the hallway toward defendant while crouching at the corner of the building.

Curtes McPherson testified she was with defendant at the motel the day he was shot. Defendant told her the police were looking for him. After the telephone in the motel room rang and no one was on the other end of the line, defendant told McPherson it was time to go, and they began loading the car. At defendant's request, McPherson went back to the room to see if defendant had left anything inside. Before she got back outside, defendant came back into the room and suggested they walk out as a couple "because there was a cop outside." As they stepped outside, McPherson saw "lots of police coming around the corner and yelling, 'Stop or I will shoot.'" She then heard five shots and saw defendant on the ground on his back. She did not see defendant draw a gun, but she had seen defendant remove a chrome handgun from the waistband of his pants while they were in the motel room. McPherson also testified that while they were talking in the motel room, defendant had told her "that he knew when he was approached by the cops, they would probably take him out, and he said he would be taking a cop out with him, and he would not go out alone."

Officer Keller and another officer both testified that when they approached defendant after the shooting, they saw a chrome semiautomatic

handgun on the ground about a foot away from him. Another officer later removed one bullet from the chamber of the gun and five from the gun's magazine.

From the foregoing evidence, the jury could have found beyond a reasonable doubt that when defendant was confronted by the two police officers outside the motel, he drew a loaded handgun from his waistband with the intent to shoot both officers, but he only managed to point it at one of the officers before they both shot him. By drawing the gun with the intent to shoot the officers, defendant performed an overt act sufficient to constitute an assault on both of them. Defendant did not have to perform the further act of actually pointing the gun directly at Officer Wagstaff to be guilty of assaulting Wagstaff. It was enough that defendant brought the gun into a position where he could have used it against Wagstaff if the officers had not shot him first.

Citing *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d 114, 29 P.3d 197], defendant contends his "single act of pointing a gun at Keller does not amount to an attempt to commit a battery on Wagstaff[]" because pointing the gun at Officer Keller was not the "last proximate step" toward completing a battery on Officer Wagstaff. Defendant contends that under *Williams* he "would have had to change the aim of his gun and/or move into a different position" to assault Officer Wagstaff. We disagree.

In differentiating the mental state required for assault from that required for criminal attempt, the *Williams* court noted that "criminal attempt 'need not be the last proximate or ultimate step toward commission of the substantive crime' . . . ." (*People v. Williams, supra,* 26 Cal.4th at p. 786, quoting *People v. Kipp* (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) From this statement, defendant attempts to draw the corollary that an assault "must be the last proximate step to a complete battery . . . ." We do not discern any such holding from *Williams*, however.

In clarifying the mental state required for assault, the Supreme Court explained that an assault is an act done toward the commission of a battery and that "[a]n assault occurs whenever ' "[t]he next movement would, at least to all appearance, complete the battery." ' " (*People v. Williams, supra,* 26 Cal.4th at p. 786, quoting Perkins & Boyce, Criminal Law (3d ed. 1982) p. 164, italics omitted.) ■ We do not understand this statement to mean that for the crime of assault to occur, the defendant must in every instance do everything physically possible to complete a battery short of actually causing physical injury to the victim. Such a holding would be inconsistent with numerous precedents, including, but not limited to, *People v. McMakin,*

*supra*, 8 Cal. 547, *People v. Hunter, supra*, 71 Cal.App. 315, and *People v. Thompson, supra*, 93 Cal.App.2d 780. As the Supreme Court explained in *McMakin*, an assault may be committed by "[h]olding up a fist in a menacing manner, drawing a sword, or bayonet, [or] presenting a gun at a person who is within its range . . . ." (*People v. McMakin, supra*, 8 Cal. at p. 548.) Here, as explained above, the jury could have found beyond a reasonable doubt that defendant drew a loaded handgun from his waistband with the intent to shoot both of the police officers who were pursuing him. Even following the Supreme Court's decision in *Williams*, that is sufficient to support both of defendant's convictions for assault.

As for defendant's contention that he did not have the present ability to injure Officer Wagstaff because Wagstaff was in a "protected position" behind the corner of the building when the shooting occurred, that argument fails on the facts and on the law. First, as noted above, Agent Moutinho testified that Wagstaff actually stepped into the open and directed a command at defendant before yelling "Gun" and diving for cover. The jury could have found beyond a reasonable doubt that defendant had the ability to shoot Officer Wagstaff before he dove for cover. Furthermore, both Agent Moutinho and Officer Keller testified that Officer Wagstaff fired at defendant from around the corner, which means, at the very least, part of Wagstaff's body was still exposed to injury from defendant's gun as the shooting occurred. Second, the fact that Officer Wagstaff may have been sheltered, in whole or in part, by the building did not preclude the jury from finding defendant had the present ability to injure him. "Once a defendant has attained the means and location to strike immediately he has the 'present ability to injure.' The fact an intended victim takes effective steps to avoid injury has never been held to negate this 'present ability.' " (*People v. Valdez* (1985) 175 Cal.App.3d 103, 113 [220 Cal.Rptr. 538].)

In summary, we conclude there was substantial evidence in the record to support the jury's finding that defendant was guilty of assault with a deadly weapon on Officer Wagstaff.

### Jury Instructions

Again relying on the Supreme Court's recent decision in *People v. Williams*, defendant contends the jury instructions on assault were erroneous. In *Williams*, the court held that "assault requires actual knowledge of those facts sufficient to establish that the offending act by its nature would probably and directly result in physical force being applied to another." (*People v. Williams, supra,* 26 Cal.4th at p. 784.) Defendant contends the jury here was not instructed on the "actual knowledge" element of assault

articulated in *Williams* and the error was not harmless beyond a reasonable doubt. Once again, we disagree.

As the People point out, the assault instructions in this case included an "intent" component that was not included in the instructions given in *Williams*. Specifically, the court instructed the jury that to prove assault, it must be proved that "at the time the act was committed, the person intended to use physical force upon another person or to do an act that was substantially certain to result in the application of physical force upon another person . . . ." As defendant contends, however, this "intent" instruction did not instruct the jury on the "actual knowledge" element of assault because, like the instruction found wanting in *Williams*, this instruction could have permitted "a conviction premised on facts the defendant *should have known but did not actually know*." (*People v. Williams, supra,* 26 Cal.4th at p. 790.)

The question, then, is whether the "minor ambiguity" in the instruction was harmless beyond a reasonable doubt. (*People v. Williams, supra,* 26 Cal.4th at p. 790.) Defendant contends it was not harmless because, properly instructed, the jury might have found that he did not know Officer Wagstaff was even present and therefore might have acquitted him of assaulting Officer Wagstaff. We disagree.

Contrary to defendant's assertion, there is no evidence in the record to suggest he "did not know he was facing two officers on the sidewalk." Defendant did not testify. Accordingly, there is no direct evidence defendant was unaware of Officer Wagstaff's presence. Furthermore, defendant's suggestion he did not know of Wagstaff's presence because Wagstaff "was in a protected position around the corner" ignores the evidence of how Wagstaff got in that position in the first place. As noted above, Agent Moutinho testified Officer Wagstaff dove back to the corner of the building only after commanding defendant to put his hands up, or something like that, then yelling "Gun." This testimony supports the conclusion that defendant was indeed aware of Officer Wagstaff's presence and in fact drew his gun in response to Officer Wagstaff's commands. Finally, we note McPherson's testimony that when she stepped out of the motel room with defendant, she saw "lots of police coming around the corner and yelling . . . ." If McPherson saw more than one officer, it is certainly reasonable to conclude defendant did as well.

Viewing the record in its entirety, we find no support for defendant's suggestion that the failure to instruct on the "actual knowledge" element of assault articulated in *Williams* was prejudicial. On the contrary, we conclude beyond a reasonable doubt the jury's assault verdicts would have been the

same even if the assault instructions had included the "actual knowledge" element.

*Judicial Misconduct*

Defendant next contends the trial court committed misconduct by intervening in the examination of witnesses and by aligning itself with the prosecution as it did so. The People contend defendant waived any claim of judicial misconduct by failing to object in the trial court and, in any event, there was no misconduct. We agree with the People on both points.

"It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred." (*People v. Corrigan* (1957) 48 Cal.2d 551, 556 [310 P.2d 953].) Here, despite his contention that the trial court "consistently displayed a bias in favor of the prosecution." defendant never objected to the trial court's participation in the examination of witnesses. Accordingly, defendant has waived any claim of error.

In any event, there is no merit in defendant's claim of error. "A court may control the mode of questioning of a witness and comment on the evidence and credibility of witnesses as necessary for the proper determination of the case. [Citations.] Within reasonable limits, the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination. [Citation.] A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution." (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206-1207 [96 Cal.Rptr.2d 158].)

In *Santana*, the defendant was convicted of possessing methamphetamine and cocaine for sale based on evidence that he "had been present at the scene of an anticipated sale of nine pounds of methamphetamine and that, 10 months later in a search of his home, deputies found a triple beam Ohaus scale and cash." (*People v. Santana, supra,* 80 Cal.App.4th at pp. 1196-1197.) At trial, during the defense case, the defendant's wife, Teresa Duarte, testified she used the scale to weigh the components of bread she baked; Saul Ramirez testified he and the defendant operated a carpet sales and installation business; and the defendant testified he had been at the scene of the anticipated drug sale to visit his daughter, but his green card was found on the counter because he had taken it from his pocket to avoid bending it when he sat down. The trial court actively participated in the cross-examination of Duarte, Ramirez, and the defendant.

Although Division Three of the Second Appellate District found the evidence sufficient to support the defendant's convictions, the appellate

court also found the trial court's adversarial intervention in the trial required reversal of the judgment. Putting aside a number of "innocuous incidents" in which the trial court intervened in the examination of witnesses, the appellate court noted that the trial court had "repetitiously, disparagingly and prejudicially questioned defense witnesses Ramirez, Duarte and Santana." (*People v. Santana, supra,* 80 Cal.App.4th at p. 1207.) The court wrote: "The trial court's questioning of Duarte regarding use of the triple beam Ohaus scale in baking, the questions of Ramirez regarding the partnership agreement and business, and the questioning of Santana regarding the resident alien card, all consumed more time than was necessary to elicit the point the trial court sought to make. By belaboring points of evidence that clearly were adverse to Santana, the trial court took on the role of prosecutor rather than that of an impartial judge. By continuing this adversarial questioning for page after page of reporter's transcript, the trial court created the unmistakable impression it had allied itself with the prosecution in the effort to convict Santana. These instances of impropriety are so egregious as to require reversal of Santana's conviction." (*Ibid.*)

The record in this case shows the trial court was involved in the examination of approximately half of the 40 witnesses who testified, almost all of whom testified for the prosecution. The question is whether the trial court, by involving itself in the examination of these witnesses, "took on the role of prosecutor rather than that of an impartial judge," "creat[ing] the unmistakable impression it had allied itself with the prosecution in the effort to convict" defendant. We find no such misconduct.

"Numerous courts including our own have recognized that it is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible." (*People v. Carlucci* (1979) 23 Cal.3d 249, 255 [152 Cal.Rptr. 439, 590 P.2d 15].) " '[I]t has been repeatedly held that if a judge desires to be further informed on certain points mentioned in the testimony it is entirely proper for him to ask proper questions for the purpose of developing all the facts in regard to them. Considerable latitude is allowed the judge in this respect as long as a fair trial is indicated both to the accused and to the People. Courts are established to discover where lies the truth when issues are contested, and the final responsibility to see that justice is done rests with the judge.' " (*Ibid.,* quoting *People v. Lancellotti* (1957) 147 Cal.App.2d 723, 730 [305 P.2d 926].)

Here, it appears to us the trial court's participation in the examination of witnesses invariably involved questions seeking to clarify the testimony of the various witnesses and to fully develop the pertinent facts. For

example, during the direct examination of the prosecution's first witness, a clerk at a convenience store who said defendant was the person who robbed her, the clerk testified defendant had a canvas bag over his hand during the robbery. The following exchange then occurred:

"Q Did the way he was holding his hand in the bag cause you to believe he might have a weapon?

"A Yes. He told me that he did have a weapon.

"THE COURT: What words did he use to tell you that?

"THE WITNESS: He said, 'Give me all you cash or I will blow your fucking head off.' "

The prosecution then resumed questioning the witness.

Defendant argues that "[i]n pressing the witness for a direct quote, the trial court put before the jury inflammatory language used by the robber . . . ." Even if so, that is not enough to establish judicial misconduct. There is no indication the trial court knowingly elicited the "inflammatory language" to which the witness testified. The court simply asked the witness to state the exact words the robber used to tell her he had a weapon. In doing so, the court performed its duty "to see that the evidence is fully developed before the trier of fact . . . ." (*People v. Carlucci, supra,* 23 Cal.3d at p. 255.)

It would serve little purpose to detail further the numerous instances in which the trial court participated in the examination of witnesses. This court has thoroughly reviewed the transcript of the trial and each instance of the trial court's participation in the questioning of witnesses, and we are satisfied that the trial court's involvement did not constitute misconduct. The trial court did not "persistently make[] discourteous and disparaging remarks so as to discredit the defense or create the impression it [was] allying itself with the prosecution." (*People v. Santana, supra,* 80 Cal.App.4th at pp. 1206-1207; cf. *Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 788-789, 797 [119 Cal.Rptr. 841, 532 P.2d 1209] [finding trial judge committed willful misconduct when he "expressed his disbelief in the testimony of a defendant by having created a sound commonly referred to as a 'raspberry' "].) The court's questions were neither repetitious, disparaging, nor prejudicial. The court also did not belabor points of evidence that clearly were adverse to defendant. Defendant contends the trial court "consistently displayed a bias in favor of the prosecution" but offers no concrete example

of any such bias, and we find none ourselves. As one commentator recently observed, "[a] judge does not become an advocate merely by asking questions." (Levenson, *Unnerving the Judges: Judicial Responsibility for the Rampart Scandal* (2001) 34 Loyola L.A. L.Rev. 787, 796.)

"The duty of a trial judge, particularly in criminal cases, is more than that of an umpire; and though his power to examine the witnesses should be exercised with discretion and in such a way as not to prejudice the rights of the prosecution or the accused, still he is not compelled to sit quietly by and see one wrongfully acquitted or unjustly punished when a few questions asked from the bench might elicit the truth. It is his primary duty to see that justice is done both to the accused and to the people. He is, moreover, in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench." (*People v. Golsh* (1923) 63 Cal.App. 609, 614-615 [219 P. 456].)

Rather than resembling the "egregious" "instances of impropriety" that justified reversal of the judgment in *People v. Santana, supra,* 80 Cal.App.4th 1194, the trial court's questions in this case resembled the "more innocuous incidents" the *Santana* court put aside. (*Id.* at p. 1207.) Accordingly, we conclude no misconduct occurred.

### DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 29, 2002.