Filed 6/3/15  P. v. Schwarz CA3
Opinion following transfer from Supreme Court.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C059021 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F07920) |
| v. | |
| JOHN BRUCE SCHWARZ, | |
| Defendant and Appellant. | |

A jury convicted defendant John Bruce Schwarz of possession of methamphetamine and unlawful possession of a firearm.  (Health & Saf. Code, § 11377, subd. (a); Pen. Code, § 12021, subd. (c)(1).)  The trial court suspended imposition of sentence and granted defendant probation.  Defendant timely appealed.

In a supplemental brief, defendant contended his Sixth Amendment right to confront the evidence against him was violated because the analyst who tested the alleged drugs was not called as a witness; instead, her report was described by the testimony of her supervisor, himself an expert drug analyst.  Applying the United States Supreme

1

Court decision in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314] (*Melendez-Diaz*), we agreed with defendant, and because the error was not harmless beyond a reasonable doubt, we reversed the drug possession count.

As to the gun possession count, we rejected defendant's contentions that the prosecutor committed misconduct by diluting the reasonable doubt standard during closing argument, that the trial court became an advocate for the People by asking too many questions, and that the trial court misinstructed the jury on circumstantial evidence.

We also agreed with defendant's contentions that the probation order was defective and remanded the case for further proceedings.

Thereafter, the California Supreme Court granted the People's petition for review. It then transferred the case to this court with directions to vacate our prior decision and to reconsider the cause in light of *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*), and *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221] (*Williams*). (Cal. Rules of Court, rule 8.528(d).) We have done so and upon reconsideration reject defendant's arguments under the confrontation clause, as well as his arguments on prosecutorial misconduct and instructional error, as applied to both the gun possession and drug possession counts.

## FACTS

The parties stipulated that on February 24, 2006, defendant was convicted of brandishing a knife, a misdemeanor in violation of Penal Code section 417. As a matter of law, that conviction prohibits defendant from possessing firearms for 10 years. (Pen. Code, § 12021, subd. (c)(1).)

Officer Jacob Gullion, of the Sacramento Police Department, testified that at about 1:00 a.m. on August 14, 2007, he and two other officers arrived at a house and defendant answered the door. The house had two bedrooms, one with men's clothing and one with women's clothing. In the former, Officer Gullion found mail addressed to defendant at

2

that address.  On a desk in that bedroom he found two glass narcotic smoking devices and a black container with a white crystalline substance in clear plastic.  Based on his training and experience, he believed the substance was methamphetamine.  In a drawer of that desk he found two packages, each of which contained 100 one-inch-square plastic bags used for drug sales, and a handgun.  On a dresser he found a computer printout with instructions for making methamphetamine.  In defendant's pocket, Officer Gullion found five more of the small baggies, a couple of which contained white residue that looked like methamphetamine.  Defendant told Officer Gullion that he found the gun at a construction site.

A 911 call by defendant's mother at 1:05 that morning was played for the jury.  In part, she stated that other people were in defendant's room with him, dealing drugs.  She also said that defendant had a gun and used "crank," and that morning she found instructions in his computer about "how to cook it."  Officer Michael Smith testified that as the officers arrived, he spoke to a man (not defendant) sitting on the porch.

Ray Bartneck testified he is a supervising criminalist at the Sacramento County District Attorney's Laboratory of Forensic Services and has worked there for over 26 years.  He has a bachelor's degree in forensic science with minors in biology and chemistry, and over 27 years "of crime lab experience, including seven to eight years of bench experience in the analysis of controlled substance[s].  Over the years, I have been the supervisor of the chemistry unit which tests for drugs off and on now for maybe seven or eight years."

In the drug laboratory, an analyst retrieves the substance from the evidence section; then observes, weighs, and tests the substance; then uses notes, entered into a computer, to record the results in a report.  Bartneck reviews the report, along with the analyst's notes, before he approves it.  Bartneck has qualified over 100 times as a courtroom expert in testing controlled substances.

Bartneck testified that a subordinate, Deborah Henry, chemically tested the substance in this case. Henry had worked in the laboratory for over 18 years, Bartneck had personally watched her work, and she was given yearly proficiency testing, which she had always passed so far as he knew. Bartneck reviewed Henry's laboratory notes and her report in this case. He also reviewed printouts from a gas chromatograph/mass spectrometer, which records the chemical components of a sample.

Several times during his testimony, Bartneck stated that he trusted that Henry did the things her notes and report state she did. Three illustrations follow:

1. "Q[.] Did Miss Henry receive the alleged narcotic sample in a sealed condition?

"A[.] Yes, she did."

2. "Q[.] Did Miss Henry analyze the sample accurately?

"[Objection overruled.]

"[A.] Based upon my review of her notes, yes, she did."

3. "Q[.] And she wrote orange down, but you don't know as a matter of fact whether or not she actually did the test?

"A[.] She put it in her notes. I believe she did the test.

"Q[.] Okay. So you believe she did the test because it was in her notes, but you didn't see her do it?

"A[.] I have no reason to suspect that she didn't do it."

Based on his review of Henry's notes, Henry's report, and the chromatograph/spectrometer printouts, Bartneck testified he agreed with Henry's conclusion that the "sample contains methamphetamine, net weight 4.57 grams."

The parties stipulated that 4.57 grams was a useable amount of methamphetamine.

Henry's report was introduced into evidence *without objection*. It is signed by Henry and Bartneck, but not under penalty of perjury, and it is not written in the form of an affidavit or declaration.

## DISCUSSION

## I. Confrontation Clause

At trial, defense counsel explained that she had thought Henry was *sick* but learned she was merely out of town: "Being sick and out of town are two different things. . . . I think this was a way to skirt around the issue of getting someone here appropriately and allowing defense to know who is going to testify and who is not." Counsel moved to strike Bartneck's testimony because he was "merely reading" from Henry's report. The motion was denied.

On appeal, defendant, citing *Melendez-Diaz*, *supra*, 557 U.S. 305, argued that the trial court should have granted his motion to strike Bartneck's testimony because defendant was "deprived of the right to cross-examine the preparer" of the laboratory report. Bartneck's testimony, in effect, was that Henry was a diligent and experienced analyst, and that he believed she competently performed the tests her report states she performed, with the results stated in the report. Defendant asserted that Bartneck's testimony "was functionally a substitute for the [analyst's] testimony on direct examination," and although Bartneck was cross-examined, that did not enable defendant to confront Henry.

In *Melendez-Diaz*, a drug case, the prosecutor introduced sworn affidavits from a laboratory attesting to the weight and nature of the drugs. This procedure was authorized by a Massachusetts statute. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 308.)

*Melendez-Diaz* held the affidavits were testimonial and the procedure prevented any cross-examination of the analysts: "In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ' "be confronted with" ' the analysts at trial." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 311.) In our earlier opinion, we agreed with defendant's application

5

of *Melendez-Diaz*, concluding that defendant had no effective means to challenge whether Henry, the laboratory analyst, correctly performed the tests reflected by her written report. The error was not harmless beyond a reasonable doubt, and though cognizant of cases pending review in the California Supreme Court considering the scope of *Melendez-Diaz*, we reversed his conviction for possession of methamphetamine under authorities then extant.

As directed by the Supreme Court, we now reconsider defendant's claim and our prior conclusion in light of decisions postdating *Melendez-Diaz*, the United States Supreme Court decision in *Williams*, *supra*, ___ U.S. ___ [132 S.Ct. 2221] and three California Supreme Court decisions: *Lopez*, *supra*, 55 Cal.4th 569, *Dungo*, *supra*, 55 Cal.4th 608, and *Rutterschmidt*, *supra*, 55 Cal.4th 650.

We begin with the United States Supreme Court's decision in *Williams*, a case in which a state police crime lab analyst was permitted to testify as an expert in a rape prosecution that the defendant's DNA profile matched the DNA profile in a sample taken from the victim, though the analyst played no role in performing the laboratory tests required to produce the defendant's profile. The Supreme Court rejected the defendant's claim that the analyst's testimony violated the confrontation clause. A plurality concluded the analyst's testimony was not admitted for its truth but for the limited purpose of explaining the basis for her independent expert conclusion, reached after examining the laboratory reports, that the defendant's DNA from the state police lab profile matched the profile produced by an independent lab (Cellmark) from the victim's vaginal swabs. (*Williams*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at pp. 2239-2240] (plur. opn. of Alito, J.), as construed by the court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*).) Alternately, the plurality reasoned that the Cellmark DNA report was not testimonial. It was not prepared primarily for the purpose of prosecuting an accused, but to find a dangerous rapist who remained at large and a threat. (*Williams*, at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) Justice Thomas

6

provided the decisive vote to affirm, concluding that the Cellmark DNA report "lack[ed] the solemnity of an affidavit or deposition." (*Id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)

Following the Supreme Court's decision in *Williams*, the California Supreme Court decided three other cases.

### Lopez

In *Lopez*, *supra*, 55 Cal.4th 569, the criminalist who analyzed the blood sample of a defendant in a vehicular manslaughter case did not testify and the prosecution did not assert that he was unavailable. Instead, testimony was offered by the supervisor who had trained the absent criminalist and who professed to be " 'intimately familiar' " with his procedures and how he tests blood for alcohol content. (*Id.* at p. 574.) Indeed, according to the supervisor, all of the workers in the lab were trained to process blood alcohol analyses in the same manner. (*Ibid.*) The testing criminalist used a gas chromatograph to analyze the blood sample and prepared a report, the critical parts of which were five pages of a computer printout generated by the gas chromatography machine indicating the sample contained a blood-alcohol concentration of 0.09 percent and a sixth page (the first page in order) that contained a notation, entered by a lab assistant, linking the defendant to the blood sample tested by the gas chromatograph. The defendant challenged the admission of the supervisor's testimony and the laboratory report prepared by the absent criminalist as a violation of his rights of confrontation. (*Id.* at pp. 582-584.)

Our Supreme Court set forth the controlling principles: As a threshold matter, "the prosecution's use at trial of testimonial out-of-court statements ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*Lopez*, *supra*, 55 Cal.4th at p. 581.)

And what is "testimonial?" The court noted the United States Supreme Court had not settled on a definition, but their decisions intimate that a testimonial statement has

7

*two "critical components:"* 1) the statement must have been made with some degree of formality or solemnity, and 2) its primary purpose must pertain in some fashion to a criminal prosecution. (*Lopez*, *supra*, 55 Cal.4th at pp. 581-582.)

Applying these principles, the court concluded the introduction into evidence of the machine-generated printouts shown on pages two through six did not implicate the Sixth Amendment's right to confrontation. The raw data generated by such machines are not statements and machines are not declarants as discussed in the *Crawford* decision. (*Lopez*, *supra*, 55 Cal.4th at p. 583.) Though the signature of the nontestifying criminalist appeared on a page containing a printout of the machine's calibrations, and though his initials appeared on the other pages, no statement by the criminalist, express or implied, appeared on any of the pages. (*Ibid*.) Thus, *Crawford*'s restriction on testimonial out-of-court statements was not implicated. The court acknowledged the importance of the lab assistant's notation on the first page of the criminalist's report but concluded: "The notation in question does not meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity." (*Lopez*, *supra*, 55 Cal.4th at p. 584.) The admission of the report, including the five pages reflecting that the blood sample tested contained 0.09 percent alcohol and the lab assistant's notation on a single page indicating the blood sample was taken from defendant, did not violate the confrontation clause.

**Dungo**

In *Dungo*, *supra*, 55 Cal.4th 608, a murder prosecution proceeded without the testimony of the physician who prepared the autopsy report on the victim. Instead, a forensic pathologist testified and described the condition of the victim's body as recorded in the autopsy report and attached photographs. The pathologist provided his independent opinion as to the cause of death (strangulation) based on objective facts set forth in the autopsy report. Neither the report nor the photographs were introduced into

8

evidence, and the testifying pathologist made no reference to the conclusions contained in the autopsy report as to cause of death. (*Id*. at pp. 613-615.)

The Supreme Court concluded the objective facts related to the jury "were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question." (*Dungo*, *supra*, 55 Cal.4th at p. 621.)

With respect to the formality of that portion of an autopsy report containing statements about the condition of the body, the court opined that "[t]hese statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 312, fn. 2 . . . ." (*Dungo*, *supra*, 55 Cal.4th at p. 619.)

As to the primary purpose of autopsy reports, the court noted their purpose is not limited to criminal investigation. They serve many other equally important purposes, including determination of insurance coverage and as a basis for civil actions. (*Dungo*, *supra*, 55 Cal.4th at p. 621.) Thus, neither of the two "critical components" applied to determine whether an out-of-court statement is testimonial was present.

"In summary, [the forensic pathologist's] description to the jury of objective facts about the condition of [the] body, facts he derived from [the] autopsy report and its accompanying photographs, did not give [the] defendant a right to confront and cross-examine [the author of the report]. The facts that [the forensic pathologist] related to the jury were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question." (*Dungo*, *supra*, 55 Cal.4th at p. 621.)

*Rutterschmidt*

9

*Rutterschmidt, supra*, 55 Cal.4th 650 is a case in which a laboratory director, relying on lab tests conducted by others, testified the victims had been drugged. (*Id*. at pp. 655-656.) However, the court had no occasion to address the confrontation clause issues raised in the cases discussed earlier herein. It concluded the overwhelming evidence of the defendants' guilt rendered any error harmless beyond a reasonable doubt. (*Id*. at p. 661.)

Collectively, the United States Supreme Court decision in *Williams* and our Supreme Court's opinions in *Lopez* and *Dungo* lead us to conclude that defendant's rights under the confrontation clause of the Sixth Amendment were not violated. The out-of-court statements here at issue—the statements contained in Henry's laboratory notes and report—were not made with the degree of formality or solemnity required to be considered testimonial in nature. Nothing in the record indicates Henry swore or attested to the accuracy of the procedures used or the results reached.

While defendant insists the outcome of this case is controlled by *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705], that case was decided before the United States Supreme Court's later pronouncements in *Williams*, which in turn guided our Supreme Court's decision in *Lopez*, the facts of which are remarkably similar to the facts before us in the present appeal. While defendant may believe that *Lopez* was wrongly decided, our status as an intermediate appellate court binds us to follow it and all other decisions of the California Supreme Court purporting to apply decisions of the United States Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In *Lopez*, the court was clear in describing the "critical components" of a testimonial statement. The disputed statements here lack the formality and solemnity required to be considered testimonial. It is significant that only a single justice dissented from the conclusion that no Sixth Amendment violation occurred in *Lopez*, though four justices, as did we, struggled with the difficulty of finding "a workable rule that does not render it a constitutional violation whenever the prosecution

10

fails to call to the stand everyone 'whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device.' [Citation.]" (*Lopez*, *supra*, 55 Cal.4th at p. 586.)

Here, as in *Lopez*, the critical step in testing for methamphetamine involved the use of a gas chromatograph that produced an electronic printout indicating the substance tested was methamphetamine. Henry's report, notes, and test results, including the electronic printout from the gas chromatograph, were properly admitted into evidence as business records and properly relied on in Bartneck's testimony as an expert witness on the laboratory procedures followed in testing and arriving at the conclusion that the substance was methamphetamine. Given his examination of the records available to him, his professional training, and his background as Henry's supervisor, Bartneck could properly opine, without violating the confrontation clause, that the substance tested was 4.57 grams of methamphetamine.

## II. Prosecutorial Misconduct: Reasonable Doubt

The trial court instructed the jury on reasonable doubt before testimony was taken and at the end of the trial. The jury was also instructed to follow the law as given by the trial court, not the attorneys.

During argument, defense counsel emphasized the prosecutor's burden of proof beyond a reasonable doubt. In part, defense counsel distinguished the criminal standard of proof from the civil standards and, to illustrate her view of "abiding conviction," gave the example of the certainty needed about how one's parachute was packed before one jumps out of an airplane.

In rebuttal, the prosecutor read the part of the reasonable doubt instruction stating that not every possible doubt was a reasonable doubt. As the prosecutor continued with closing argument, the following took place:

"[Prosecutor:] As the Judge stated, each of the elements must be proved beyond a reasonable doubt. That was one of the instructions that both of us went over. The law

11

tells you what reasonable doubt is not. It's not absolute. It's not imaginary doubt and it's not based on speculation. But we know what reasonable doubt is. It's something that is used in courtrooms every day and it's not an absolute—it's not a difficult standard. It's based on the evidence. And as I stated before, it's not based on speculation or any other improper source. It's reasonable.

"[Defense Counsel]: Objection. Misstates the standard and lowers the burden.

"The Court: Ms. Price, your objection is overruled. The jury has the instructions which define the standard."

On appeal, defendant contends that by stating the standard was not "a difficult" one, but one "used in courtrooms every day" and "reasonable," the prosecutor diluted the reasonable doubt standard and thereby committed misconduct.

We disagree. As stated in rejecting a similar claim:

"Defense counsel's argument and the court's jury instructions unambiguously communicated to the jury that the prosecution had the burden of proving every element of the case beyond a reasonable doubt. The record does not demonstrate that the prosecution employed deceptive or reprehensible methods to persuade the jury, and, in light of the entire record, there was no reasonable likelihood that the jury erroneously construed the prosecution's burden of proof." (*People v. Samayoa* (1997) 15 Cal.4th 795, 842.)

In evaluating the prosecutor's remarks, "we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The prosecutor's comments, in context, did not dilute the standard of proof. The prosecutor referenced the instruction that had been given by the trial court and correctly argued that the standard was "not absolute. It's not imaginary doubt and it's not based on speculation." Although in the abstract the reference to the standard "used in courtrooms every day" could seem to blend the civil and criminal standards, in context that is not how the argument would have been understood by the jury. Nor, in context, do we

12

believe the jury would interpret the remark that the standard was not "difficult" but was "reasonable" to mean that it was not important for the jury to hew closely to the standard *as defined by the trial court*.

Moreover, even if we agreed the prosecutor overstepped the bounds of permissible argument, such error did not cause any prejudice. The trial court instructed the jury to follow the law as given by the trial court, not the attorneys, and the prosecutor referred to the reasonable doubt instruction given by the trial court before making the challenged remarks. If the jury interpreted the prosecutor's remarks as describing a lower standard of proof, there is no reason to believe it would have followed that standard rather than the standard given by the trial court. We presume the jury would follow the trial court's instructions, including the instruction to disregard those statements of the law given by attorneys that conflicted with the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).)

### III.  Judicial Misconduct:  Questioning Witnesses

During Officer Gullion's testimony, the trial court sometimes interrupted to ask questions, sometimes two or more in a series. The trial court asked other witnesses a number of questions. These were separate from questions asked by the court but submitted by jurors.

On appeal, defendant contends that by asking so many questions, the trial court became the People's advocate, depriving him of the right to a neutral judge.

This contention has been forfeited by lack of objection.

There were three objections to *specific* questions asked by the trial court. One was a foundational objection to a question by the trial court about what kinds of substances could be smoked in the devices found in defendant's room. One was an unspecified objection to a question by the trial court about the significance of the size of the smaller baggies. The third was a foundational objection to a question about whether the residue on the baggies found in defendant's pocket was on the inside or outside of the baggies.

13

But defense counsel never objected that the trial court was asking *too many* questions or was asking them *in a biased manner*.

The California Supreme Court has held that the lack of objection forfeits claims of judicial misconduct: "It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred." (*People v. Corrigan* (1957) 48 Cal.2d 551, 556; see *People v. Hines* (1997) 15 Cal.4th 997, 1040-1041; *People v. Wright* (1990) 52 Cal.3d 367, 411.) We have repeatedly applied this rule to claims of improper questioning by judges. (*People v. Raviart* (2001) 93 Cal.App.4th 258, 269 (*Raviart*); *People v. Pierce* (1970) 11 Cal.App.3d 313, 321-322 (*Pierce*); *People v. Flores* (1952) 113 Cal.App.2d 813, 817 (*Flores*).)

Accordingly, the claim of judicial misconduct has been forfeited for lack of an objection at trial.

Defendant relies on two older appellate court decisions that addressed claims of judicial bias through excessive or inappropriate questioning. In one, the appellate court quoted the trial court's extraordinary questioning at great length, supporting the court's view that the lack of objection was excused because an objection would have been futile. (*People v. Robinson* (1960) 179 Cal.App.2d 624, 637-638, 639-657 (*Robinson*).) But in that case, the judge's questions were *partisan*, "of a nature which tended to develop the case of the People." (*Id*. at p. 633.) Nothing in the record before this court suggests partisanship or that an objection would have been futile. In the other case relied on by defendant, *People v. Campbell* (1958) 162 Cal.App.2d 776 (*Campbell*), the issue of preservation of claims of error was not discussed. Cases are not authority for propositions not considered. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176; *People v. Watkins* (2009) 170 Cal.App.4th 1403, 1409.) Accordingly, the lack of objection forfeits the claim of error. (*Raviart*, *supra*, 93 Cal.App.4th at p. 269.)

14

Moreover, even if we excused the lack of objection, we would reject the contention of error. As we have said before: "The trial judge has the duty to control all proceedings during the trial with a view to the expeditious and effective ascertainment of the truth regarding the matters involved. (Pen. Code, § 1044.) To this end he may examine witnesses to elicit or clarify testimony. [Citations.] The mere fact that a judge examines a witness at some length does not establish misconduct, nor does the fact that the testimony elicited by the judge's questions would probably have been elicited by counsel." (*Pierce*, *supra*, 11 Cal.App.3d at p. 321; see *Raviart*, *supra*, 93 Cal.App.4th at p. 270; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1108.)

On the other hand, "[u]nwarranted interruptions of counsel that interfere with a properly conducted examination, excessive questioning that virtually takes the witness out of counsel's hands, or a display of partisanship are improper." (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 544.) "The question for us to decide is whether the judge 'officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution[.]' " (*People v. Clark* (1992) 3 Cal.4th 41, 143, quoting *Campbell*, *supra*, 162 Cal.App.2d 776; see *People v. Cummings* (1993) 4 Cal.4th 1233, 1305.)

Whether a particular question or series of questions by a judge goes too far is difficult to assess on a cold record because we cannot determine if the tone of any particular question was other than neutral, and because the transcript does not indicate the length of pauses by the attorneys in between the answer to one question and the asking of another. (*Raviart*, *supra*, 93 Cal.App.4th at p. 272 [trial court is " 'in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench' "].) In his reply brief, defendant asserts that "nothing in the record suggests that the prosecution was acting in anything other than an expedited manner or leaving any ambiguities unresolved." But it is defendant's burden,

as the appellant, to show error, and we cannot assume the trial court intervened too quickly or inappropriately.

And even if this trial judge asked *too many* questions, that does not mean he lost his *neutrality*. Nothing about the *content* of the questions shows a lack of neutrality. Defendant faults the trial court in two specific instances, for "all but [laying] the foundation for the exhibits and the presumptive field test for the prosecution[,]" and for asking Officer Gullion why he booked the bags containing the smaller baggies into evidence. Defendant asserts this testimony was "highly" prejudicial. We need not address these examples because of our reversal of the drug possession count. Other than those two examples, there is no claim the trial court asked *improper* questions, "and this being so, it is difficult to understand how the interrogation by the court could have constituted prejudicial error." (*Flores*, *supra*, 113 Cal.App.2d at pp. 817-818; see *People v. Golsh* (1923) 63 Cal.App. 609, 615; *People v. Hunt* (1915) 26 Cal.App. 514, 517.)

Finally, we observe that the trial court instructed the jury with CALCRIM No. 3550, which in part provides: "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." We presume the jury followed this instruction and would consider the content of the answers to the trial court's questions and not the fact that the questions were asked *by the trial court* in assessing the evidence. (*Sanchez*, *supra*, 26 Cal.4th at p. 852.)

Accordingly, we reject the claim of judicial misconduct.[1]

___

[1] Although we have rejected the claim of error, both procedurally and on the merits, we observe that some of the judicial interruptions, although not harmful, were not necessary. It is best to allow each counsel to develop her or his case, except when intervention is necessary, and then to intervene at the least intrusive time: "Ordinarily the proper course, and the one generally pursued, is to allow the examination by counsel—direct, cross, redirect and recross—to conclude, and then if anything in the judgment of the trial court remains obscure, which may be material for the jury to know, and it seems desirable that

16

## IV. Instructional Error:  Circumstantial Evidence

Defense counsel reviewed the proposed instructions, had not asked for any that were refused, and stated she was "happy with everything we discussed in chambers." She referred to the circumstantial evidence instructions in argument, CALCRIM Nos. 223 and 225.

CALCRIM No. 223 defines circumstantial evidence.

CALCRIM No. 225, as given, cautions the jury about circumstantial evidence used to prove a mental state:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

On appeal, defendant contends the trial court should have instructed with CALCRIM No. 224 instead of CALCRIM No. 225.  The difference is that CALCRIM

---

an examination of the witness should be further pressed, then, with perfect propriety, the trial court may, and, indeed, should, intervene so that the ends of justice may be subserved.  This, however, should be done with care[.]"  (*Robinson*, *supra*, 179 Cal.App.2d at p. 639.)

17

No. 224 is broader, and in its second paragraph, CALCRIM No. 224 cautions the jury about the use of circumstantial evidence to prove any fact, not just a mental state. It would have provided, in part: "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Putting aside defense counsel's express statement that she was content with the instructions, we reject defendant's contention of prejudicial error. The California Supreme Court, discussing the analogous CALJIC instruction, stated as follows: "We have held that the court must give such an instruction on its own motion when the proof of guilt rests substantially on circumstantial evidence. [Citations.] But the instruction need not be given when the circumstantial evidence merely corroborates other evidence [citations], because in such cases the instruction may confuse the jury regarding the weight to which other evidence is entitled[.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 142.)

The gun charge was proven by direct evidence: the gun was found in defendant's room and he admitted possessing it. There was no basis to give CALCRIM No. 224 in connection with that charge. As to the drug possession charge, defendant makes a plausible claim that CALCRIM. No. 224 should have been given, in light of the fact that no one directly observed him possess the methamphetamine. However, even assuming error, the failure to instruct was clearly harmless. An error in instructing the jury will result in a reversal of the judgment only if the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; see also *People v. Rogers* (2006) 39 Cal.4th 826, 885-887.) A miscarriage of justice occurs where it appears reasonably probable that the defendant

18

would have achieved a more favorable result had the error not occurred. (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) It is not reasonably probable the jury would have concluded defendant did not possess the methamphetamine had it been instructed with CALCRIM No. 224.

The jury was instructed on circumstantial evidence. The court gave CALCRIM No. 223, describing the difference between direct and circumstantial evidence. The jury was instructed on reasonable doubt. Defendant's counsel linked the two in argument: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." Faced with his mother's disclosure suggesting he was making drugs and the subsequent discovery of methamphetamine in a sleeping room occupied by him, defendant chose to focus on his mental state. He questioned whether the prosecution's evidence established his mental state—his "knowledge" of the substance. Referring no doubt to the language of CALCRIM No. 225, he argued "you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state." Thus, defendant relied on the language of the instruction given, CALCRIM No. 225, and the court's instruction on reasonable doubt to make the most plausible argument under the circumstances: that the presence of the drug in his room, among his belongings, did not compel a conclusion that he possessed the drug; the jury could conclude that he had no knowledge of the drug. It is not reasonably probable that a jury instructed in the language of CALCRIM No. 224 would have reached a different conclusion.

## V. Attorney Fees

At sentencing, defense counsel asserted defendant was indigent. The probation report supported this view, as defendant's only employment was as his mother's caregiver, for which he was paid $200 per month. The report also states: "If there are

19

reimbursable costs to the County in the disposition of this case for appointed counsel, presentence investigation, probation supervision or incarceration, it is recommended the defendant be ordered to report to the Department of Revenue Recovery for a financial evaluation and recommendation of ability to pay said costs."

One of the formal probation conditions, as recommended by the probation report, item No. 9, is as follows: "Defendant [shall] pay through the Court's installment process the amount determined and report to the Department of Revenue Recovery within [five] (5) days of sentencing or within five (5) days of release from custody for an evaluation and recommendation of ability to pay and for development of a payment schedule for Court-ordered costs, fees, fines and restitution[.]"

An apparently garbled passage of the reporter's transcript shows the trial court stating: "I am required to order that you pay an attorney fee to the county in the amount of $2,440, that's to be a condition on your ability to pay the fees. [¶] You are required to cooperate with the Division of Revenue Recovery in the determination of your ability to pay."

The relevant statute provides, in part: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided." (Pen. Code, § 987.8, subd. (b).)

Defendant contends the trial court did not hold a noticed hearing. But the probation report gave notice of the intended procedure, and the statute gave the trial court

20

discretion to order defendant to cooperate with the relevant county department to determine his ability to pay all or part of the attorney cost determined by the court. That procedure comports with law. (Cf. *People v. Flores* (2003) 30 Cal.4th 1059, 1062 [simply ordering reimbursement " 'subject to his ability to pay' " does not comply with statute].) This procedure does not deprive defendant of the right to a hearing; it defers the matter until the county department assesses defendant's ability to pay, which he can then contest. (See *People v. Spurlock* (1980) 112 Cal.App.3d 323, 328; Couzens & Bigelow, Basic Elements of Felony Sentencing (Barrister Press 2009) p. 171 [trial court "[m]ay refer defendant to county financial evaluation officer for recommendation" on ability to pay].)

However, the written probation order states: "Defendant shall pay a $2,000.00 attorney fee. Payable through the Court's installments [*sic*] process." This does not conform to the trial court's oral pronouncement. We accept the reporter's transcript of what the trial court said over the probation order prepared by the court clerk. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) The order states the wrong amount and also fails to capture the idea that defendant would have an opportunity for a determination of his ability to pay. Further, the probation order does not clearly show that payment of fees was not a *condition* of probation. (See *People v. Bradus* (2007) 149 Cal.App.4th 636, 641.) On remand, the trial court should clarify the probation order regarding the attorney fees.

## VI. Narcotics Fees

After imposing the minimum $200 restitution fine, the trial court imposed "other fines and fees" stated in the probation report. Among these were fees of $50 and $150 for Health and Safety Code sections 11372.5 and 11372.7, plus penalties and assessments on those amounts. The probation order states those amounts.

Those fees are authorized when a defendant is convicted of specified narcotics offenses. (See Health & Saf. Code, §§ 11372.5, subd. (a), 11372.7, subd. (a).) In our

prior opinion, we reversed defendant's drug count as well as the imposition of the associated fees. In light of our judgment on reconsideration, we conclude the fees were properly imposed. We also agree with the parties that the fees cannot be made conditions of probation. The probation order is unclear on this point and should be clarified to avoid any suggestion that the fees are imposed as conditions of probation.

## DISPOSITION

The probation order is vacated with directions to the trial court to impose a new order consistent with this opinion. In all other respects the judgment is affirmed.


                                                   RAYE , P. J.


We concur:


NICHOLSON , J.


BUTZ , J.

22