Filed 6/4/15  P. v. Serena CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ISAIAH SERENA,<br><br>Defendant and Appellant. | F068172<br><br>(Super. Ct. No. CRM025130)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Before Cornell, Acting P.J., Gomes, J., and Smith, J.

Isaiah Serena was convicted of assault with a firearm, being a felon in possession of a firearm and ammunition, and unlawfully carrying a loaded firearm in a public place. He argues that there was insufficient evidence to support the conviction of assault with a firearm. He also argues that the court improperly granted the People's motion to try those four counts together with two other counts, which arose from facts occurring on a different date and of which Serena was acquitted. We will affirm.

## FACTS AND PROCEDURAL HISTORY

The district attorney filed accusatory pleadings against Serena in two cases, No. CRM024722 and No. CRM025130. Case No. CRM024722 was based on events that took place on August 25, 2012. It alleged two counts: being a felon in possession of a firearm (Pen. Code,[1] § 29800, subd. (a)(1)) and being a felon in possession of ammunition (§ 30305, subd. (a)(1)). Case No. CRM025130 was based on events that took place on October 14, 2012. It alleged four counts: assault with a firearm (§ 245, subd. (a)(2)); being a felon in possession of a firearm (§ 29800, subd. (a)(1)); carrying a loaded firearm in a public place while a felon (§ 25850, subd. (c)(1)); and being a felon in possession of ammunition (§ 30305, subd. (a)(1)).

The district attorney filed a motion on March 12, 2013, to consolidate the two cases. The court granted the motion on April 5, 2013, over Serena's opposition. The operative information, filed on August 14, 2013, listed the counts in the following order: (1) assault with a firearm on October 14, 2012 (§ 245, subd. (a)(2)); (2) being a felon in possession of a firearm on October 14, 2012 (§ 29800, subd. (a)(1)); (3) carrying a loaded firearm in public while being a felon on October 14, 2012 (§ 25850, subd. (c)(1)); (4) being a felon in possession of ammunition on October 14, 2012 (§ 30305, subd. (a)(1)); (5) being a felon in possession of ammunition on August 25, 2012 (§ 30305, subd. (a)(1)); and (6) being a felon in possession of a firearm on August 25,

___

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

2012 (§ 29800, subd. (a)(1)).  The information alleged in connection with each count that Serena had a prior strike conviction under the Three Strikes Law (§§ 667, subds. (b)-(i), 1170.12), namely, being an active member of a criminal street gang (§ 186.22, subd. (a)).

At trial, Officer Joseph Perez of the Merced Police Department testified that he went to a pool hall around 11:00 p.m. on August 25, 2012, in response to a report of a person with a gun.  Perez and his partner entered the pool hall from the back as two other officers entered from the front.  Perez saw Serena sitting at a table with three other people.  Two of these were Serena's cousin, Gilbert Guerrero, and Guerrero's wife, Rosa Trevino.  Serena fit the description of the person in the report.  As the officers came in, Serena got up and began walking toward the back of the pool hall.  Then Perez made eye contact with Serena, and Serena returned quickly to his table.  Perez and the other officers approached the table.  Watching from behind Serena, Perez saw Serena "fully extend out his arms like he was making a passing motion towards the lap area" of Guerrero.  Serena's movement was "[k]ind of like a [quarterback] handing off to a running back."  Serena and Guerrero spoke to one another.  Guerrero and Trevino then both made "a motion."

The officers searched Trevino's purse and found a .380-caliber semiautomatic handgun inside.  Inside the gun was a magazine loaded with six cartridges.

Perez later searched Serena's cell phone.  He found two photos of Serena holding a gun.

Trevino testified that she was with Guerrero and Serena at the pool hall on the night in question.  Serena got up from their table just as some police officers were entering, then turned around and came back to the table.  She saw Serena give something to Guerrero, but did not see what it was.  As she saw the police coming closer, Trevino grabbed the object and put it in her purse.  She claimed she still did not know it was a gun when she grabbed and concealed it.  She conceded, however, that a picture of her purse with a gun inside showed what she put in her purse.

3.

The same night, Guerrero made a statement to Officer Perez. The statement was recorded and transcribed and the recording was played for the jury. During the interview, Perez asked Guerrero if he touched the gun, and Guerrero said Serena threw it in his lap:

"Q:     Well lemme ask you this just to be specific. At any time did you touch that gun? Because we obviously hafta send it off cause the DA's gonna be like (unintelligible) .…

"A:     He pushed it off of me.

"Q:     Huh? He pushed it off of you? So your prints or DNA's gonna be on that thing.

"A:     (Unintelligible) I don't know. I, like he said, he (unintelligible) fuckin' thrown in my lap I just what the fuck. I was sittin' down, I didn't [see] him comin' he just came running over toward me and he just threw something in my lap and .…

"Q:     And you were just kinda like, hot potato? Get this off'a me?

"A:     I was shocked. I was—yeah get the—I was what the fuck. I didn't even know you guys were coming here until I seen like three of you guys comin' this way talkin' about hands up. I was like what the f .…"

At trial, Guerrero testified that his statement to Perez was a lie. What really happened, he said, was that the gun was his and he gave it to his wife earlier that night. She put it in her purse.

Carlos Tun Torres and his father-in-law, Jorge Salazar, were the victims of the assault on October 14, 2012. Torres testified that he went with Salazar to a bar called Club Bahia in Merced on that date. They had left the club and were walking to their car when three or four people accosted them. Serena was one of the attackers. One of the attackers stabbed Torres in the ribs with a sharp object, making a puncture wound. Police arrived and broke up the fight. The police asked Torres whether he wanted to press charges, and Torres said no. The police left, and Torres and Salazar continued walking to the parking lot by the pool hall, where they had left their car.

4.

When Torres and Salazar reached the parking lot, a man Torres described as fat walked out of a building, said something, and ran back in. Then Serena came out of the building and tried to punch Salazar. Torres told Serena to leave Salazar alone, and Serena said to drop the bat. Torres and Salazar did not have a bat. Torres and Salazar were telling Serena they weren't from around there and he should leave them alone when Torres heard someone say "get the banger, get the banger." Torres understood "banger" to mean a gun. Torres saw the fat man open the trunk of a car and saw Serena approach the trunk. Torres ran. He heard three gunshots. He and Salazar kept running and then stopped and called the police. Torres never saw Serena holding the gun.

When the police came, they showed Torres a person they had in custody and asked if he was the one who had attacked them. It was not. Then the officers drove Torres to a house and showed Serena to him. Torres identified Serena as the one who attacked him.

Salazar's testimony generally confirmed Torres's account. In the first encounter with Serena, Serena hit Salazar once. Later, in the parking lot, Salazar heard Serena yell that he was going to get his gun. He and Torres ran. Salazar did not hear the shots.

Barrett Daniels, who worked as a waiter at a restaurant on Main Street in Merced, testified that he had just gotten off work and was walking to the parking lot on the night in question when he saw an altercation. He watched from about 30 feet away. One man, "a bigger gentleman," said "get the chopper." A second man ran to a car and opened the door. Daniels then saw a gun in the second man's hand and saw him running, chasing after two men who ran away. Daniels heard a shot and saw the man with the gun run back to the car and put the gun inside. The man then took his shirt off and ran away down an alley. He passed close by Daniels, "so close to my face I could touch him." Daniels identified the man as Serena.

A surveillance video was played for the jury. Daniels confirmed that it showed the events he had witnessed.

5.

Daniels believed he saw the victims run to a truck and saw Serena fire into the truck. When shown the video, however, Daniels concluded that he was mistaken. The people in the truck were not the victims of the assault and the shot had not been fired into the truck. Daniels could not see where Serena fired and by the time he did so, Daniels could no longer see the victims.

Officer John Pinnegar of the Merced Police Department testified that he was one of the officers who came to the scene after the shooting. There he interviewed Alexandria Ceja, who told him she witnessed the incident. She identified Serena as the shooter, and Ceja had the gun in her car. Ceja said Serena put it on her front seat after the shooting. The gun, found by Pinnegar under the front seat of Ceja's Honda Accord, was a .40-caliber Smith & Wesson handgun with three live cartridges inside.

Ceja's interview with Pinnegar was recorded, and the recording was played for the jury. Ceja told Pinnegar she went to one of the bars on Main Street that night with her brother and a friend. There they met Serena, with whom they were acquainted. Ceja said she considered Serena a troublemaker and she and her brother did not like him. She saw Serena fighting with two men. The police came, but they let Serena go. Later, she saw him fighting with them again in the parking lot. The two men had a bottle and "like a belt or something" and one was saying he didn't want any problems. Serena said, "I got a banger, I got a banger." Then, "he was like 'eh, fuck these dudes' and shot." Ceja heard one shot. Ceja saw Serena holding the gun in his right hand. Pinnegar asked, "Did you see him point it?" Ceja said yes. At one point, Pinnegar asked Ceja, "Who shot at 'em?" Ceja answered, "Isaiah."

After firing the shot, Serena went to Ceja's car, opened the passenger door and put the gun inside. Then he said, "I gotta go, I gotta go," and ran off.

When she testified at trial, Ceja claimed to remember little of what happened. She remembered the first fight, but not the second. She testified that she did not remember seeing Serena holding or pointing a gun, did not remember any shooting, did not

6.

remember a gun being in her car, and did not remember describing any of these events to Pinnegar. She said she did not remember whether she had driven her car when she went out that night.

Officer Moses Nelson of the Merced Police Department was another of the officers who came to the scene of the incident. He identified some photographs of a spent cartridge casing and a live bullet he found in the parking lot. He also testified about a surveillance video he viewed of the incident. He said it showed a man in a white t-shirt running with his hand extended, holding what appeared to be a gun. The video was played for the jury.

Officer Perez authenticated a recording of a telephone call between Serena and a woman Perez identified as the mother of Serena's children. The call took place on July 24, 2013. The recording was played for the jury. In the course of an argument about children, Serena and the woman made reference to Serena firing a gun:

"[Woman]    God, Isaiah, I mean, come on. You're fucking with my kids emotionally.

"[Serena]    Shut up, dude. For reals.

"[Woman]    That's no.

"[Serena]    You don't got no room to talk dude.

"[Woman]    You know what, that's not cool.

"[Serena]    You're so fuckin retarded, dude.

"[Woman]    What do you mean I have no room to talk?

"[Serena]    For reals.

"[Woman]    I take care of my kids.

"[Serena]    That motherfucker stole the laptop and you go over there, fuckin, backing him up at court like a dumbass girl, eh. How dumb are you dude?

7.

"[Woman]     What?

"[Serena]     Fuckin stupid, I swear.

"[Woman]     You shot a gun in the air and I still went on your court. You're fuckin guilty.

"[Serena]     That's, oh, well, I wasn't with you.  That didn't have nothing to do with you, dude.

"[Woman]     That has no, ok, I'm not saying that.

"[Serena]     What the fuck.

"[Woman]     Because that has to do with one of my kids."

The only defense witness was Dr. Richard Blak, a forensic psychologist.  He testified about factors that can cause errors in eyewitness identifications.

The jury found Serena guilty of counts 1 through 4 (based on the events of October 14, 2012) and not guilty of counts 5 and 6 (based on the events of August 25, 2012).  Serena admitted the prior-strike allegation for counts 1 through 4.

The court sentenced Serena to eight years—double the upper term—on count 1. Pursuant to section 654, it stayed the sentences for counts 2 through 4.

## *DISCUSSION*

### I.     *Sufficiency of evidence of assault with a firearm*

Serena contends that the evidence was insufficient to prove count 1, assault with a firearm.  When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which the finder of fact could make the necessary finding beyond a reasonable doubt.  We presume every inference in support of the judgment that the finder of fact could reasonably have made.  We do not reweigh the evidence or reevaluate witness credibility.  We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

Proof of an assault "only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) There is no requirement of a specific intent to cause injury or a subjective awareness of a risk of injury. (*Ibid.*) To prove assault with a firearm, the prosecution must also show that "'the defendant used a firearm in the commission of the offense.'" (*People v. Sinclair* (2008) 166 Cal.App.4th 848, 856.)

Serena says none of the witnesses testified that they saw him pointing the gun at Torres or Salazar and that this means assault with a firearm was not established. Serena's argument is thus based on the notion that assault with a firearm cannot be proved absent evidence that the perpetrator aimed the firearm at a person.

There is no reason to accept this notion. The offense's elements are that the perpetrator used a firearm in the carrying out of an intentional act that will probably and directly result in force being applied to a victim, plus the perpetrator's knowledge of the facts showing the likelihood of this result. Certainly a person who points a gun at another can thereby commit assault with a firearm, but we see no reason why this would be the only way to commit that offense. (See *People v. Raviart* (2001) 93 Cal.App.4th 258, 263 ["Assault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime."] (*Raviart*).) Here, the evidence indicated that, after initiating a fight with Torres and Salazar, Serena grabbed a gun from a car; then he chased Torres and Salazar, running with the gun in his extended hand, and finally fired at least one shot. This was enough to support a finding that, using a firearm, Serena knowingly committed an intentional act that by its nature would probably and directly result in the application of physical force to the victims.

*Raviart* well illustrates the point. Two police officers, Wagstaff and Keller, confronted Raviart after he became a suspect in a robbery. Raviart pointed a handgun at

9.

Keller and then was shot by both officers. He was convicted of two counts of assault with a firearm on a peace officer, one count for each victim. (*Raviart, supra*, 93 Cal.App.4th at pp. 261-262.) The Court of Appeal rejected Raviart's argument that the evidence was insufficient because it showed that he pointed the gun at only one officer. Based on the evidence, the jury could convict on two counts:

> "[T]he jury could have found beyond a reasonable doubt that when defendant was confronted by the two police officers outside the motel, he drew a loaded handgun from his waistband with the intent to shoot both officers, but he only managed to point it at one of the officers before they both shot him. By drawing the gun with the intent to shoot the officers, defendant performed an overt act sufficient to constitute an assault on both of them. Defendant did not have to perform the further act of actually pointing the gun directly at Officer Wagstaff to be guilty of assaulting Wagstaff. It was enough that defendant brought the gun into a position where he could have used it against Wagstaff if the officers had not shot him first." (*Raviart, supra,* 93 Cal.App.4th at p. 266.)

*Raviart* demonstrates there is no rule that, to be guilty of assault with a firearm, a defendant must be proved to have pointed a gun at a victim. Where the evidence supports an inference that the defendant's act with the gun was intended to harm the victim, the jury can find an assault with a firearm even if the gun was never actually pointed at the victim. The evidence that Serena first picked two separate fights with Torres and Salazar, and then chased them while holding the gun in his extended hand and firing, supported the needed inference.

Several other cases cited in *Raviart, supra*, 93 Cal.App.4th at pages 263-264, support this conclusion. (*People v. Thompson* (1949) 93 Cal.App.2d 780, 781-783 [defendant guilty of assault with deadly weapon even though he pointed his gun downward and between two deputies, not at them; it was sufficient that defendant made implied threat and gun "was in a position to be used instantly"]; *People v. Hunter* (1925) 71 Cal.App. 315, 316-319 [defendant guilty of assault with deadly weapon even though victim escaped before defendant could finish drawing gun from his sock; trying to draw

10.

gun was sufficient overt act and was immaterial whether he ever pointed it at victim]; *People v. McMakin* (1857) 8 Cal. 547, 547-549 [assault proved where defendant pointed gun toward victim but downward, so that bullet would hit ground, not victim; sufficient if defendant holds gun "in such a position as enables him to use it before the other party could defend himself"].)

Even if pointing the gun at the victims was an element of the offense, the jury could reasonably infer that Serena did that. In addition to the evidence that Serena ran after Torres and Salazar with the gun in his hand and fired, there was Ceja's statement supporting the conclusion that Serena fired at the victims: Pinnegar asked, "Who shot at 'em?" Ceja answered, "Isaiah." There also was Ceja's affirmative answer when Pinnegar asked if she saw Serena "point" the gun.

Serena cites *People v. Carmen* (1951) 36 Cal.2d 768 (*Carmen*), overruled on other grounds by *People v. Flannel* (1979) 25 Cal.3d 668, 684, footnote 12. *Carmen* is a murder case in which our Supreme Court held that the trial court ought to have given manslaughter instructions to the jury. On the way to this conclusion, the Supreme Court quoted *People v. Peak* (1944) 66 Cal.App.2d 894, 901, which stated: "'Thus, while it is not an assault to fire a gun in the air for the purpose of frightening another, it is an assault … to fire a gun at another or in the direction in which he is standing.'" (*Carmen, supra*, at p. 775.) This is the proposition on which Serena relies. The *Carmen* court went on to disapprove of *Peak* because of an erroneous conclusion *Peak* reached about the means of proving malice for purposes of second degree murder. (*Carmen, supra,* at p. 776.)

*Carmen* does not help Serena. First, our Supreme Court in *Carmen* neither approved nor disapproved of the *Peak* court's proposition that "it is not an assault to fire a gun in the air for the purpose of frightening another .…" It cited *Peak* for the purpose of disapproving *Peak*'s holding on another point. Second, assuming *Peak* remains persuasive authority on the point that firing in the air to frighten is not assault, it still fails

11.

to reveal error in this case. The evidence here did not confine a reasonable fact finder to a finding that Serena fired in the air to frighten Torres and Salazar. Instead, it supported a finding that Serena continued his unprovoked attacks on Torres and Salazar by chasing them out of the parking lot while pointing a gun and shooting. This finding, together with Ceja's identification of Serena when asked "[w]ho shot at 'em," was adequate to support an inference that Serena's act was an assault and that he used a firearm in the commission of it.

Serena also cites *People v. Herrera* (1970) 6 Cal.App.3d 846, 851, in which the Court of Appeal stated: "The offense of assault with a deadly weapon requires proof only of an attempt to commit a violent injury upon the person of another; does not require proof an injury occurred; and is supported by an inference from proof a gun was fired in the direction of another." In relying on this, Serena falls into a logical fallacy. No doubt the charge can be supported by a showing that a defendant fired a gun at a victim, but this does not imply that it can never by supported by any other factual scenario. *Herrera* is not inconsistent with the view that an inference of guilt is supported by proof that the perpetrator extended his hand, pointed the gun, and fired while chasing the victims away.

For all the foregoing reasons, we reject Serena's contention that there was insufficient evidence to support the conviction on count 1.

## II.     *Consolidation*

Serena maintains that the trial court erred when it granted the prosecution's motion to consolidate case No. CRM025130 with case No. CRM024722. Case No. CRM025130 was based on the events of October 14, 2012; it became counts 1 through 4, which were the assault, the carrying and possession of a firearm, and the possession of ammunition. Case No. CRM024722 was based on the events of August 25, 2012; it became counts 5 and 6, possession of a firearm and ammunition.

Section 954 provides in part:

"An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.… [Further,] the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately .…"

We review the trial court's ruling for abuse of discretion, but we analyze "underlying determinations pursuant to the test appropriate thereto." (*People v. Alvarez* (1996) 14 Cal.4th 155, 187-188.) We examine independently the questions of whether the joined offenses are connected together in their commission, are different statements of the same offense, or are of the same class of crimes or offenses. We defer to the trial court's sound discretion on the question of whether the interests of justice require the counts to be tried separately. (*Id.* at p. 188.)

Consolidation was proper in this case because the two charges from case No. CRM024722 were of the same class of crimes as two of the charges from case No. CRM025130. Counts 5 and 6 charged the same two crimes as counts 2 and 4: being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and being a felon in possession of ammunition (§ 30305, subd. (a)(1)).

Serena first argues that the court erred as a matter of law because counts 5 and 6 were not of the same class of crimes and were not connected together in the commission of count 1, the assault. This argument presupposes that, in order to be properly included in a consolidated accusatory pleading, a count must be related to *each* of the other counts in the pleading—not just to one or some of them—through one of the relationships listed in section 954. In this case, counts 5 and 6 are of the same class of offenses as counts 2 and 4; counts 1 through 4 are connected together in their commission, having happened on a single occasion; and counts 5 and 6 are likewise connected together in their

commission. Serena assumes that this is not enough. In his view, each count is required to have one of the listed connections to each of the others.

Serena has cited no authority for this notion, and it is not correct. Suppose a defendant commits robbery on two dates and steals methamphetamine from each victim. He is charged with two counts of robbery and two counts of possessing methamphetamine. According to Serena's argument, the four counts could not be tried together. Each possession count would be connected together in the commission of one robbery, but not the other; and each robbery would be in the same class of crimes as the other robbery, but not in the same class of crimes as methamphetamine possession. The defendant would have to be given two trials: either one trial for each date or one trial for the robberies and one for the possession counts. This is not the law.

Serena's next argument is that the court abused its discretion because the interests of justice required the two cases to be tried separately. He cites *People v. Cunningham* (2001) 25 Cal.4th 926, 985, in which our Supreme Court listed several factors to be considered in determining whether a danger of prejudice exists requiring charges to be tried separately. These are whether "(1) evidence related to the crimes to be tried jointly would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case; and (4) any one of the charges carries the death penalty." Serena contends there was no cross-admissibility between the August 25 and October 14, 2012, incidents. He also says the October 14 case was a stronger case being used by the prosecution unfairly to bolster the weaker August 25 case, or else both cases were weak and the consolidation improperly bolstered both.

We agree that there was no cross-admissibility. This is not, however, an example of a prosecutor cobbling one adequate case together from two feeble ones or propping up an inadequate case with a better one. For the August 25 case, the prosecution had statements by both Guerrero and Trevino that Serena passed the gun to Guerrero and that

14.

Trevino put it in her purse. The officers saw furtive movements by Serena, Guerrero, and Trevino that were consistent with this story. If the jury had returned a guilty verdict, the evidence would have been more than sufficient to support it. The October 14 case was based on multiple eyewitness accounts of Serena starting a fight and then running after the victims with a gun, followed by the sound of gunfire. It was not weak.

This case does not involve the death penalty, of course, and Serena does not argue that any of the charges are unusually inflammatory. There was no abuse of discretion.

Even if the court should have denied the motion to consolidate, Serena has not shown that he was prejudiced by consolidation. (*People v. Renier* (1957) 148 Cal.App.2d 516, 520 [appellant must show prejudice amounting to miscarriage of justice to obtain reversal where cases improperly consolidated].) Serena was acquitted on counts 5 and 6. The jury did not believe it was proved that he possessed the loaded gun on August 25, 2012. In light of this, and given the extensive testimony of multiple eyewitnesses to the October 14, 2012 incident, we do not see any reasonable likelihood of a better outcome for Serena on counts 1 through 4 if the jury had not heard of the previous incident. There was no miscarriage of justice.

## DISPOSITION

The judgment is affirmed.