Filed 3/12/25  P. v. Perez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANIBAL ANTONIO PEREZ,<br><br>      Defendant and Appellant. | B334801<br><br>(Los Angeles County<br> Super. Ct. No. MA083301) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Strassner, Judge.  Affirmed.

Liberty Bell Law Group, Alan Tavelman and Michele H. Kendall for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————

Anibal Antonio Perez appeals from the judgment of conviction after the jury found him guilty of multiple sexual offenses against his stepdaughter, N.G., and his biological daughter, L.P., beginning when the girls were around 10 and 11 years old, respectively. Perez was convicted of one count of forcible rape of a child, two counts of sexual penetration of a child, two counts of oral copulation of a child, and three counts of lewd acts upon a child. The jury also found true Perez committed lewd acts against multiple victims.

On appeal Perez contends the prosecutor engaged in prejudicial misconduct during her closing argument by highlighting that Perez failed to introduce evidence of inconsistencies between L.P.'s trial testimony and her earlier out-of-court police and forensic interviews. Perez contends this was improper vouching for L.P.'s credibility and shifting of the burden of proof to Perez. Perez also contends the prosecutor engaged in misconduct by playing an audio recording that N.G. made of a confrontation with Perez and his parents, which she recorded without their consent in violation of Penal Code section 632.[1] Finally, Perez argues the trial court committed prejudicial misconduct in its questioning of L.P. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution Case*

1. *Sexual abuse of N.G.*

N.G., who was 19 years old at the time of the trial, testified that Perez began to sexually abuse her when she was 10 years

---

[1] Further undesignated statutory references are to the Penal Code.

old and continued the abuse until she was about 15. Throughout this period N.G. lived in Lancaster with her mother, Ana; her half-sister, L.P. (who is four years younger than N.G.); an older half-sister, Melissa; and Perez. Perez had lived with the family since N.G. was about four years old, and N.G. regarded Perez as her father. However, even before the abuse started, N.G. had a strained relationship with Perez, Ana, and Melissa.

One night, when N.G. was 10 years old, Perez came into her bedroom and lay down next to her, telling her that he had a nightmare. While she was lying on her side, Perez put his hands down her pajama pants and inside her underwear, and he rubbed her vagina. Perez also put his hands up her pajama top and touched her breasts. He pressed his erect penis against her bottom. Perez then said goodnight and left the bedroom. N.G. did not tell anyone because she did not understand that what had occurred was wrong.

When N.G. was 11 or 12 years old, Perez came into N.G.'s bedroom one day when the two were home alone, and he began to scold her for failing to take out the trash. He put his hands on her shoulders, pushed her down on to the bed, and removed her pants and underwear. Perez removed his pants, wrapped a plastic grocery bag around his erect penis, and penetrated her vagina repeatedly. After Perez "finished," he pulled up his pants and left N.G. in her room. She was in pain and bleeding from her vagina, but Perez told her this was because she was having her period.

On multiple subsequent occasions from when N.G. was 12 to 13 or 14 years old, Perez came into her bedroom at night while the rest of the family was sleeping. He woke her up by tickling her feet and then carried or pulled her by her arm into the kitchen. He would place N.G. on the kitchen table, pull down her

3

pants and underwear, and perform oral sex on her, penetrating her vagina with his tongue. Sometimes Perez would lift N.G. off the table and have her get on her knees, then push her head down on his penis to perform oral sex on him. Perez would ejaculate onto N.G.'s face or clothes and leave her in the kitchen.

Perez, who worked as a building contractor, would also bring N.G. to his work sites in his truck, and on multiple occasions he parked his truck near a public park or job site and put his hands down her pants and rubbed her clitoris. Other times he would have N.G. lie down on the front seat and perform oral sex on him while he was driving. On one occasion when N.G. was about 11 years old, Perez brought her inside a home where he was doing renovations and performed oral sex on her while she was lying on the living room carpet.

On another occasion when N.G. was 13, she stayed home sick from school. While Ana was out of the house, Perez came into N.G.'s bedroom and laid her down on her bed. He placed a condom on his penis, put it inside N.G.'s vagina, and had intercourse until he ejaculated. He removed the condom and flushed it down the toilet. N.G. did not tell anyone about any of these incidents at the time because she feared she would be blamed for breaking up the family.

In 2020 or 2021, when N.G. was about 16 or 17 years old, she finally told Ana that Perez had touched her sexually (although she did not tell Ana he had sexually penetrated her), and Ana kicked Perez out of the house. Perez and his parents subsequently came over to the house to ask for N.G.'s forgiveness, and N.G. surreptitiously recorded their conversation on her cell phone. The recording was played for the jury, and a transcript of the Spanish-language recording with an English-language translation was admitted into evidence without objection.

4

Although the recorded conversation has unintelligible portions, Perez told N.G. he "admitted everything" to his parents and to Ana, and he wished to ask for N.G.'s forgiveness. Perez explained he "was not doing well," and he had been abusing crystal methamphetamine. N.G. countered that she was only 10 years old when it began and that Perez was "disgusting," to which he responded, "Okay, but nothing happened," and "thank God there was no sex." Perez asserted that N.G. told him, "Okay, Tony, let's go fuck" when she was mad at her mother. N.G. countered, "That is disgusting!" and "even if that was the thing, I was 12 years old." N.G. added, "You started touching me at night, 10 years old!" Perez responded, "I accept it," but added, "There was no sex. Thank God. That didn't happen." Perez continued, "You know what I mean? Like on Raysack, when you also told me about that, that . . . I didn't have condoms or anything. So I put a trash bag on. . . ." N.G. responded, "No! You . . . forced it on me!" After Perez's mother interjected that Perez was placing the blame on himself, he responded, "Just because I'm an adult I have to accept it okay? Because she was a little girl . . . since she doesn't want to accept it, I do accept it." Perez stated that he wanted "to break this chain" and accept what happened "in order for me to free myself and be at peace." Later in the recording, Perez's mother asked him, "And what happened with [L.P.] is also true?" To which Perez responded, "What happened with [L.P.] too." N.G. shouted, "That's disgusting" and "that's your own daughter," and she walked out of the room crying.

2. *Sexual abuse of L.P.*

L.P. was 15 years old at the time of the trial. She testified that on one occasion when she was 11 or 12 years old, she was

lying on her father's lap on the living room sofa playing on her tablet computer when he put his hand up her shirt and touched her breast. Perez then lifted her shirt and began to suck on her nipple. L.P. laughed and kicked her leg because it was uncomfortable, and her leg hit Perez's head. Ana then came out of her room into the hallway, and Perez lowered L.P.'s shirt.

When L.P. was 13 years old, she told a school friend about the incident after the friend confided that she had suffered sexual abuse. The friend then told her mother about L.P.'s abuse. A short time later a uniformed police officer came to L.P.'s school and interviewed her with a social worker, without a parent present. Later that day police officers came to the family home and interviewed L.P. and N.G. separately. Defense counsel asked L.P. if there was another occasion when L.P. was interviewed at a facility "by a woman asking open-ended questions," but L.P. did not recall being interviewed.[2] She was not present for N.G.'s preliminary hearing testimony or trial testimony.

### 3. *Additional prosecution evidence*

Los Angeles County Sheriff's Detective Nichelle Carlson, who was assigned to the special victims unit, testified it was departmental policy not to conduct a sexual assault response team (SART) physical examination if a victim has disclosed a sexual assault more than 30 days after it occurred. Detective Carlson explained that the likelihood of finding DNA evidence decreases dramatically with the passage of time.

---

[2] N.G. testified that she and L.P. both participated in a forensic interview after the police interviews at home. N.G. and L.P. traveled to the facility together, but they were interviewed separately.

6

Jayme Jones, Ph.D., a clinical psychologist, testified as a prosecution expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Jones explained that CSAAS is a model developed over several decades to address how children react to sexual abuse by people they know. Dr. Jones explained that it is a common myth that children will fight back when they are abused and that they will disclose the abuse immediately. To the contrary, children, especially preadolescent children, often do not disclose abuse because they do not want to get their abuser into trouble or lose the positive aspects of a familial relationship; they also fear they will not be believed.

The prosecution introduced a certified minute order reflecting that Perez was convicted in 2002 of felony sexual battery (§ 243.4, subd. (a)).

B. *The Defense Case*

Bradley McAuliff, Ph.D., a psychology professor at California State University at Northridge, was the only defense witness. He testified as an expert on children's suggestibility in forensic interviewing. Dr. McAuliff explained that "suggestibility" broadly refers to the factors that influence the accuracy of a witness's report. Although a witness may not intentionally lie, several factors may cause the witness to lie or provide an inaccurate account without realizing it. Dr. McAuliff gave as examples that the age of the witness, the passage of time from the abuse, the involvement of authority figures, family relationships, and cross-contamination by other interviews could all lead to inaccurate reports. Children are generally more suggestible than adults, and studies have shown that when interviewing children, adults often ask questions that influence a child's responses. Repeated questioning can also make children

think they have not answered correctly or that they need to produce more information.

In light of the dangers of suggestibility and contamination, the best practices for a forensic interview of a child include asking open-ended questions, instructing the child it is fine if the child does not know the answer to a question, avoiding questions whether the child was touched in a particular place, and trying to put a child at ease by interviewing in a child-friendly environment with the questioner in plain clothes rather than a uniform. An initial interview by a police officer who does not adhere to best practices may also contaminate a later forensic interview even if the later interview is conducted under better conditions, because the child will be reluctant to contradict the earlier statements.

C.    *The Verdict and Sentencing*

The jury found Perez guilty with respect to abuse of N.G. of two counts of sexual penetration of a child under the age of 14 (§ 289, subd. (j); counts 1 & 2); two counts of a lewd act upon a child under the age of 14 (§ 288, subd. (a); counts 3 & 8); two counts of oral copulation of a minor under the age of 14 (§ 288a, subd. (c)(1); counts 5 & 6); and forcible rape of a child under the age of 14 (§ 261, subd. (a)(2); count 9). The jury found Perez guilty with respect to L.G. of a lewd act upon a child under the age of 14 (§ 288, subd. (a); count 7). The jury also found true as to counts 3, 4, and 7 that Perez committed lewd acts against multiple victims within the meaning of the one strike law (§ 667.61, subdivision (e)(4)).

In a bifurcated proceeding, the trial court found true five circumstances in aggravation under California Rules of Court, rule 4.421(a)(1), (a)(3), (a)(11), (b)(1), and (b)(2). The court

8

sentenced Perez to an aggregate sentence of 21 years, plus 45 years to life in state prison.  On each of counts 3, 7, and 8 for lewd acts the court imposed a term of 15 years to life based on the jury's multiple-victim finding.  On count 9 for forcible rape the court imposed the upper term of 13 years based on the factors in aggravation.  On each of counts 1 and 2 for sexual penetration and counts 5 and 6 for oral copulation, the court imposed a consecutive term of two years (one-third of the middle term of six years).

Perez timely appealed.

## DISCUSSION

A.     *Perez's Claims of Prosecutorial Misconduct Lack Merit*
     1.     *Governing law*

"""A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.""" (*People v. Parker* (2022) 13 Cal.5th 1, 72 (*Parker*); accord, *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657.)  It is misconduct for a prosecutor "to misstate the evidence or go beyond the record." (*People v. Fayed* (2020) 9 Cal.5th 147, 204; accord, *People v. Young* (2019) 7 Cal.5th 905, 933.)  "Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness— offering unsworn testimony not subject to cross-examination.  It has been recognized that such testimony . . . 'can be "dynamite" to the jury because of the special regard the jury has for the prosecutor.""" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480; see *People v. Hill* (1998) 17 Cal.4th 800, 828 ["Statements of

9

supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.'"].)  Improper vouching for a witness "'occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.'"  (*Rodriguez*, at p. 480; accord, *People v. Anderson* (2018) 5 Cal.5th 372, 415.)

"In evaluating [a claim of prosecutorial misconduct], we are cognizant that "'[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence."'"  (*People v. Dworak* (2021) 11 Cal.5th 881, 910; see *Parker, supra*, 13 Cal.5th at p. 72 ["During opening and closing arguments, the prosecution is given wide latitude to make "'fair comment on the evidence, including reasonable inferences or deductions to be drawn from it."'"].)  "To preserve a claim of misconduct for appeal, a defendant must make a timely objection and ask the court to admonish the jury, unless an objection would have been futile and a request for admonition ineffective."[3]  (*People v. Flores* (2020) 9 Cal.5th 371, 403; accord, *Parker*, at p. 72.)

Further, even if there was prosecutorial misconduct, ""'[a] defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more

---

[3]  Although defense counsel did not object at trial to the prosecutor's conduct, we exercise our discretion to consider Perez's contentions.  We therefore do not reach Perez's contention that his counsel's failure to object constituted ineffective assistance of counsel.

10

favorable to the defendant would have been reached without the misconduct."'" (*Parker, supra*, 13 Cal.5th at pp. 71-72; *Flores*, at p. 403.) "We review claims of prosecutorial misconduct under an abuse of discretion standard [citations], asking whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Dworak, supra*, 11 Cal.5th at p. 910; accord, *People v. Steskal* (2021) 11 Cal.5th 332, 350.)

2. *The prosecutor did not improperly vouch for L.P. in her closing argument*

Perez contends the prosecutor improperly vouched for L.P.'s credibility during her closing argument by insinuating that evidence outside the record—L.P.'s two police interviews, her forensic interview, and her preliminary hearing testimony—could have been admitted at trial if there were any inconsistencies with L.P.'s trial testimony. This contention lacks merit.

In defense counsel's closing argument, he argued there was no contemporaneous evidence of L.P.'s and N.G.'s abuse, and the prosecution relied entirely on the girls' reports years later. Further, he argued, children are suggestible, and experts in forensic child examinations recommend against "multiple interviews before the forensic interview." Defense counsel stated: "We don't know what was suggested, we don't know what came before, and we don't know . . . what was said to them in other interviews by other detectives, district attorney's office, initial law enforcement officers, the [social] workers. None of that is before you except for what [N.G.] and [L.P.] tell you. And what [L.P.] tells you is that the officer that came to the school gave her leading questions, filled in the blanks for her."

The prosecutor responded in her rebuttal as follows: "[Defense counsel] also tried to say we don't know what was said

in the other interviews . . . .  Now, as you could tell from some of the things that were introduced, again [defense counsel] has access to those interviews.  And the rules of evidence are such that you can't just put in any old previous statement because of hearsay.  But if there are inconsistent statements, either side can put in those inconsistent statements.  And although you heard there were at least three times . . . to deputies, the forensic interview, and in court at a previous hearing that [L.P.] was asked about what happened to her, [but defense counsel] did not bring in a single inconsistency, a single thing that [L.P.] said different."

The prosecutor's rebuttal was a reasonable comment on L.P.'s credibility based on evidence in the record and the arguments advanced by Perez.  Defense counsel, not the prosecutor, introduced evidence through cross-examination that L.P. had four interviews about the alleged abuse, including the police interview at school, the police interview at her home, the forensic interview, and her testimony at the preliminary hearing.  Defense counsel also elicited L.P.'s testimony that during the initial interview at her middle school, the police officer asked her close-ended questions, after refreshing L.P.'s recollection with the interview transcript.  Dr. McAuliff testified how a police officer who asks a child close-ended questions may induce a false report and contaminate a subsequent forensic interview.

Moreover, a central theme of defense counsel's closing argument was that L.P.'s initial "confession" to her friend was likely fabricated in response to her friend's disclosure of abuse, and L.P.'s claims about what had happened snowballed from there.  Defense counsel argued, "[L.P] is then all of a sudden approached by law enforcement at school.  They don't call mom and dad or anybody to come down there, but bring her into

12

somewhere inside the school with a uniformed officer and a [social] worker and start questioning her about what she had told her friend. As our expert said, that is something very hard for a child, especially a middle schooler to say, Oh, you know what? I lied to my friend. The school's going to find out that I lied. My friend is going to find out that I lied. I'm going to stick with it. That is not uncommon with these types of allegations."

The defense case was thus centered on L.P.'s out-of-court interviews and how the circumstances of those interviews (despite their contents not being admitted) caused L.P. at trial to make false statements about what had happened. The prosecutor, in pointing out that Perez failed to introduce any conflicting prior statements despite an available hearsay exception, invited the jury to draw a contrary inference about L.P.'s credibility. The prosecutor did not make any "[s]tatements of supposed facts not in evidence" to vouch for L.P. (*People v. Hill, supra*, 17 Cal.4th at p. 828.) Instead, she operated within her """"wide latitude"""" to make """"assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom.""""" (*People v. Rodriguez, supra*, 9 Cal.5th at p. 480.) The jury was also instructed with CALCRIM No. 200 that it should decide what happened "based only on the evidence that has been presented to you in this trial," and the trial court admonished the jury more than once that closing arguments were arguments and not evidence.[4]

---

[4]     Perez also argues the prosecutor improperly vouched for L.P. when the prosecutor argued to the jury that "[L.P.] would and did say those things about her own father . . . because she was telling the truth, not because it's somehow the easiest thing

13

3.      *The prosecutor did not shift the burden of proof to Perez*

Perez also argues, based on the same portion of the prosecutor's closing argument, that the prosecutor "insinuated" to the jury that Perez bore the burden to prove his innocence when she suggested Perez could have introduced prior inconsistencies to advance his case.  However, the prosecutor was well within her wide latitude in commenting on the absence of any impeaching evidence at the trial, and doing so did not, without more, amount to shifting the burden of proof.

*People v. Woods* (2006) 146 Cal.App.4th 106 (*Woods*), the only case Perez cites in support of this argument, illustrates why there was no misconduct here.  In *Woods*, the defense attorney argued the jury should not believe a police officer's testimony that he observed the defendant selling drugs because the events in the officer's report were contradicted by computer logs and several aspects of his testimony were implausible and lacked reasonable detail.  (*Id.* at p. 111.)  In her rebuttal argument, the prosecutor argued the defense attorney "'didn't bring one witness into this courtroom to say that [the officer] doesn't do it properly. That he does it in a poor manner, that he does it wrong.  That he tramples on anybody's rights. . . .  No, she is obligated to put the evidence on from that witness stand.'" (*Id.* at p. 112)  The trial

_____

to do."  The assertion that L.P. was credible because accusing her own father of a crime would be difficult was a ""'fair comment on the evidence, including reasonable inferences or deductions to be drawn from it."'" (*Parker, supra*, 13 Cal.5 at p. 72.)  L.P. testified how her report of abuse caused a schism in her family, and she no longer saw her father and paternal relatives.  And Dr. Jones explained that the fear of losing an important relationship is a significant reason why children conceal or deny familial abuse.

14

court overruled the defense attorney's objection that she was "'not obligated to do anything.'" The prosecutor then continued, "'If there was anything to show that he was a bad cop, that he did something that was misconduct or inappropriate or wrong in this day and age, you'd have heard about it. You'd have heard about it right there from the witness stand.'" (*Ibid*.) The trial court again overruled an objection by the defense attorney.

The Court of Appeal reversed the defendant's conviction, concluding the prosecutor engaged in prejudicial misconduct by vouching for the police officer, and the prosecutor violated the defendant's due process rights by arguing the defendant was "'obligated'" to prove police misconduct. (*Woods, supra*, 146 Cal.App.4th at p. 113.) Further, "a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.'" (*Id.* at p. 112.) The court reasoned the prosecutor's statement "went far beyond a mere comment on the failure of the defense to present evidence proving misconduct by [the officer]. The assertion that the defense had an 'obligation' to present evidence expressly and erroneously advised the jury that appellant bore some burden of proof or persuasion. The court not only failed to correct this misstatement, but overruled appellant's objection, thereby implying that the 'obligation' to which [the prosecutor] referred actually existed. It is inconceivable that the jury would understand this uncorrected, implicitly approved statement to mean anything other than appellant carried a burden of proof or production." (*Id.* at pp. 113-114.)

Here, the prosecutor stated correctly that "if there are inconsistent statements, either side can put in those inconsistent statements." She then stated that, although defense counsel had elicited evidence and argued in her closing that L.P. participated

15

in several interviews that tainted L.P.'s trial testimony, defense counsel "did not bring in a single inconsistency, a single thing that [L.P.] said." The prosecutor did not argue that Perez had an "obligation" to produce evidence that impeached L.P., let alone suggest his failure to do so showed Perez's guilt. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 ["A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence."].) Moreover, unlike in *Woods*, the trial court did not create juror confusion about the burden of proof by overruling a defense objection (because there was none). The court also instructed the jury with CALCRIM No. 103 that the prosecution bore the burden of proof, admonished the jury that closing arguments are not evidence, and instructed with CALCRIM No. 200 on the difference between argument and evidence. Under the circumstances, there is no reasonable likelihood the prosecutor's statement was construed as a misstatement about the burden of proof.

> 4. *The prosecutor did not commit misconduct by introducing N.G.'s secret recording of Perez*

Perez contends the prosecutor engaged in deceptive and reprehensible methods at trial by introducing N.G.'s "illegal" audio recording of Perez when he came to N.G.'s house to apologize. (See *Parker, supra*, 13 Cal.5th at p. 72 [""A prosecutor commits misconduct when his or her conduct . . . involves deceptive or reprehensible methods employed to persuade the trier of fact.""].) Perez bases his contention on section 632, subdivision (a), which makes it illegal for a person to record a

16

confidential communication without the consent of all participants.[5]

As an initial matter, Perez's contention is more properly characterized as evidentiary error rather than prosecutorial misconduct. There was nothing deceptive or reprehensible about the prosecutor's use of the recording. The prosecutor filed a motion in limine to introduce the recording, arguing the recorded statements were admissible under Evidence Code section 1220 as a party admission. At the pretrial hearing, the trial court indicated the statements were admissible, and defense counsel agreed. Defense counsel noted there was "one glitch with this, . . . which is that it is in Spanish." The court and lawyers then worked out a plan to introduce the audio recording and provide the jury with transcription and certified side-by-side translation. At trial, defense counsel elicited N.G.'s testimony she made the recording secretly and argued Perez's statements did not include any admission of sexual assault. Defense counsel never objected or argued that the recording was inadmissible, let alone that it was illegal.

In any event, it was not error or misconduct to introduce the recording. *People v. Guzman* (2019) 8 Cal.5th 673 (*Guzman*) is directly on point. In that case, a jury convicted Alejandro Guzman of two counts of committing a lewd act on a child after the jury heard a recorded phone conversation between the mother of one of the victims and Guzman's niece, Lorena, which the

---

[5]     Section 632, subdivision (a), states in relevant part, "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication" is liable for criminal fines and imprisonment.

mother recorded without Lorena's consent in violation of section 632. (*Guzman*, at pp. 676-677.) In the recording Lorena told the victim's mother that Guzman never touched her sexually, but she knew "'he's capable of doing that.'" (*Id.* at p. 678.) Guzman argued the recording was inadmissible under subdivision (d) of section 632, which provides, "Except as proof in an action or prosecution for violation of this section, evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding."

The Supreme Court affirmed Guzman's conviction, holding section 632, subdivision (d), was abrogated by the subsequent enactment in 1982 of the "Right to Truth in Evidence" provision of the California Constitution as part of Proposition 8. (*Guzman, supra*, 8 Cal.5th at p. 679.) The amendment, now codified at article 1, section 28, subdivision (f), paragraph (2) of the Constitution, provides, in relevant part, "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103." (Cal. Const., art. I, § 28, subd. (f), par. (2); see *Guzman*, at pp. 679-680.) The court held the language of the amendment not only "unambiguously abrogate[d]" section 632, subdivision (d), but the Proposition 8 ballot materials "specifically singled out 'evidence obtained through unlawful eavesdropping,' which was then 'not permitted to be presented in a criminal trial or hearing,' and advised voters that Proposition 8 would change the law so as to 'allow most relevant evidence to be presented in criminal

cases.'" (*Guzman*, at pp. 680-681.) The court concluded "the natural inference is that Proposition 8 would permit 'evidence obtained through unlawful eavesdropping' to be admitted in criminal cases." (*Guzman*, at p. 681.)

The Supreme Court also rejected Guzman's argument that "'the right to privacy outranks the right to truth in evidence'" such that section 632, subdivision (d), must be given effect. (*Guzman, supra*, 8 Cal.5th at pp. 683-684.) The court reasoned that "[a]lthough there is a conflict between the demands of Proposition 8 and section 632(d), this conflict does not lead inexorably to friction between Proposition 8 and the constitutional right to privacy. [Guzman's] argument rests on the faulty premise that the exclusionary rule of section 632(d) is one and the same as the right to privacy itself." (*Id.* at p. 684.)

Perez in his opening brief omits any reference to section 632, subdivision (d), arguing simply that the prosecutor committed misconduct by introducing an "illegal" recording. This is a distinction without a difference—*Guzman* made clear that a defendant may be convicted based on a recording obtained without a participant's consent in violation of section 632. It follows that introduction of the recording, if it is otherwise admissible, is not error, and the prosecutor's argument based on the recording was not misconduct.

In his reply brief, Perez argues that *Guzman* is distinguishable because the recording here revealed statements of Perez's parents, "people who were not victims of any crime, nor were they witnesses that were called by either side." He argues Proposition 8 "shouldn't be allowed to trample on the privacy rights of innocent people not being tried for a crime or involved in one." We are not persuaded. First, the recording in *Guzman* similarly did not involve either the victim or the perpetrator and,

19

while it is true Lorena was a trial witness, her privacy was invaded far more seriously than the incidental inclusion of Perez's parents, who barely spoke in the recording and made no personal revelations.  The Supreme Court in *Guzman, supra*, 8 Cal.5th at page 684 rejected the premise that the "exclusionary rule of section 632(d) is one and the same as the right of privacy itself."  The court observed, "[E]ven after the passage of Proposition 8, surreptitious recording of telephone conversations is still prohibited.  Presently, such recording is punishable by . . . 'both that fine and imprisonment.'  (§ 632, subd. (a).) . . . Furthermore, individuals who are injured by secret recordings made in violation of section 632 can bring civil actions against the perpetrators to recover statutory or actual damages.  (§ 637.2, subd. (a).)  Given such protective measures, we cannot say that people like Lorena have been shorn of their right to private phone conversations simply because Proposition 8 repealed the exclusionary remedy of section 632 as it applied to criminal proceedings." (*Guzman*, at pp. 684-685.)  Perez's parents similarly have not been shorn of their right to privacy by the use of N.G.'s recording to prosecute Perez.[6]

---

[6]    The only case cited by Perez in connection with the use of the recording, *People v. Lyon* (2021) 61 Cal.App.5th 237, is inapposite.  In *Lyon*, the defendant was prosecuted for violating section 632, subdivision (a), after he videotaped prostitutes in his home.  (*Lyon*, at p. 242.)  The case turned on whether the prostitutes had a reasonable expectation of privacy, so as to bring the recording within the scope of section 632.

B.    *The Trial Court Did Not Commit Prejudicial Misconduct in Questioning L.P.*

1.    *Trial court proceedings*

Perez contends the trial court committed prejudicial misconduct by asking L.P. a series of questions during defense counsel's cross-examination about L.P.'s initial interview with a police officer.  Perez points to the following questions and testimony:

*Defense counsel*:  "[I]s it fair to say that the officer was trying to get you to be more descriptive as to what happened to you?"
*Prosecutor*:  "Objection, speculation."
*Court*:  "Sustained."
*Defense counsel*:  "Was the officer giving you answers to questions that the social worker would ask?"
*L.P.*:  "I don't remember."
*Defense counsel*:  "Okay. Would [the officer] ask, like, if you said that he touched you, did -- would she ask you things like was he touch[ing] your nips and gave you the word that she was looking for?"
*Prosecutor*:  "Objection, vague and hearsay."
*Court*:  "Do you understand the question?"
*L.P.*:  "No."
*Defense counsel*:  "Okay. What I'm trying to find out from you [is] was the officer asking you open-ended questions like what happened next?  Can you describe that for me?  Or were . . . [the] questions like when he reached under your shirt did he lick your nips?"
*L.P.*:  "I don't remember."
*Defense counsel*:  "Were they giving you the words to the body parts that they were asking you about?"

21

*Prosecutor*: "Objection. Vague."

*Defense counsel*: "I think she understood the question."

*Court:* "Do you understand the question?"

*L.P.*: "Kind of."

*Defense counsel*: "Were they giving you the words to use?"

*Prosecutor*: "And, your Honor, it's compound as well."

The court then asked the following questions:

*Court*: "[L.P.], you've reviewed in terms of refreshing your recollection some [of the] transcript. When the officers were interviewing you did they ask you what happened and you told them what happened or did they put words—did they tell you what happened and then say is that what happened?"

*L.P.*: "Like, did they rephrase it for me? Is that what you're trying to say?"

*Court*: "What I'm asking is did they ask you open questions like tell me what happened with your dad? Or did they say did your dad do this and then did he do this and then did he do this? Which way did it occur?"

*L.P.*: "The second part."

*Court*: "Next question."

*Defense counsel*: "Thank you. Also, when they were talking to you they asked about him touching your nipples, do you remember that?

*L.P.*: "Yes."

### 2. *Governing law*

A trial court has the """"power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever [the court] believes that [it] may fairly aid in eliciting

the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.'"'" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 818; accord, *People v. Harris* (2005) 37 Cal.4th 310, 350; see Evid. Code, § 775 [trial court "may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party"].) "'The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair."'" (*Harris*, at p. 350; accord, *Holmes*, at p. 818.) "'A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution.'" (*People v. Raviart* (2001) 93 Cal.App.4th 258, 269; accord, *Harris*, at p. 347 [court may not "'"officiously and unnecessarily usurp[] the duties of the prosecutor . . . and in so doing create[] the impression"'" the court is allied with the prosecution].)

"It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred."[7] (*People v. Corrigan* (1957) 48 Cal.2d 551, 556; accord, *People v. Raviart, supra,* 93 Cal.App.4th at p. 269.) We review claims of judicial

---

[7] Defense counsel did not object to the trial court's questioning of L.P. However, we exercise our discretion to consider Perez's contention on the merits.

misconduct "on a case-by-case basis, examining the context of the court's [conduct] and the circumstances under which they occurred." (*People v. Abel* (2012) 53 Cal.4th 891, 914; accord, *People v. Cash* (2002) 28 Cal.4th 703, 730.) "'"[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial."'" (*Abel*, at p. 914; accord, *People v. Nadey* (2024) 16 Cal.5th 102, 155.)

3. *The trial court's questions were clarifying and did not impede the cross-examination of L.P.*

Perez contends the trial court engaged in prejudicial misconduct when it "independently interrogated [L.P.] with the intent to elicit specific testimony helpful to the prosecution and blocked defense counsel ability to get specific information on cross-examination." Perez argues, "Before the judge's question began [Perez's] attorney was not asking the witness about open ended questions, she was trying to determine whether law enforcement told her words to use for body parts, and because of the questioning by the judge, [Perez] never got the answer to question."

There was no interrogation or improper questioning. It is clear in context of the cross-examination as a whole that defense counsel was trying to elicit testimony that the police had asked L.P. close-ended questions—which Dr. McAuliff would later testify created a risk of a false report. It is also evident that defense counsel's inquiry about the identification of body parts was an attempt to help L.P. respond to the questions (directed to whether the questions were open- or close-ended). Defense

24

counsel began by asking "Was the officer giving you answers . . . *like, if you said* that he touched you, did—*would she ask* you things like was he touch[ing] your nips and gave you the word that she was looking?" (Italics added.) When L.P. said she did not understand the question, defense counsel stated, "What I'm trying to find out from you [is] was the officer asking you open-ended questions like what happened next? Can you describe that for me? Or were they saying when he—or questions like when he reached under your shirt did he lick your nips."

Defense counsel's attempts to frame the question drew multiple objections, and L.P. only "kind of" understood what she was being asked. At this point the trial court asked, "[D]id [the officers] ask you what happened and you told them what happened or did they put words—did they tell you what happened and then say is that what happened?" and "[D]id they ask you open questions like tell me what happened with your dad? Or did they say did your dad do this and then did he do this and then did he do this?" After L.P. answered that it was the latter, the court instructed defense counsel to proceed with her next question. Defense counsel did not object, she thanked the court, and she continued her cross-examination.

The only reasonable interpretation of this exchange is that the trial court helped defense counsel clarify her question after she repeatedly stumbled, and with the court's help, counsel was able to introduce evidence critical to Perez's defense that L.P. was questioned in a manner that could have resulted in a false report. The court did not elicit testimony favorable to the prosecution or criticize defense counsel's questions. And although the court stated, "Next question," after L.P. finally answered, the court did not "impede" defense counsel from asking questions narrowly tailored to body parts; in fact, the very next question was

whether L.P. recalled the police asking her if Perez touched her nipples.[8]

## DISPOSITION

The judgment is affirmed.


                                                          FEUER, J.

We concur:


        SEGAL, Acting P. J.


        PULOS, J.[*]

---

[8]     Perez also argues the trial court improperly aided the prosecution during the preliminary hearing by asking, after the prosecutor elicited L.P.'s testimony that Perez touched her breast, whether the contact was above or under L.P.'s clothing. The question was a proper clarifying question, and that portion of the preliminary hearing transcript was not used at trial.

[*]     Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.